**COMMUNITY ASSOCIATION FOR RESTORATION OF THE ENVIRONMENT (CARE), a Washington nonprofit corporation, Plaintiff,**

v.

**HENRY BOSMA DAIRY, a Washington proprietorship, aka Hank Bosma Dairy, aka Bosma Dairy, aka H & M Dairy, aka H & S Bosma Dairy, aka B & M Dairy; Liberty Dairy, a Washington proprietorship; Henry Bosma, owner and operator of Henry Bosma Dairy and Liberty Dairy; and Bosma Enterprises, a Washington corporation, Defendants.**

No. CY–98–3011–EFS.

United States District Court, E.D. Washington.

July 29, 1999.

Charles M. Tebbutt, Marianne Dugan, Facaros Dugan & Rosas, Eugene, OR, Richard C. Eymann, Eymann Allison Hunter & Jones PS, Spakone, WA, for Plaintiff.

Charles Camillus Flower, Flower & Flower, Yakima, WA, for Amicus Curiae Intervenor.

Jerry Robert Neal, Preston Gates & Ellis, Spokane, WA, John S. Moore, Velikanje, Moore & Shore, PS, Yakima, WA, for Defendants.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

SHEA, District Judge.

This case was tried to the Court to determine liability on June 1, 1999, and concluded on June 15, 1999. In a pre-trial ruling the Court had bifurcated the issues of liability and penalties. Plaintiff Community Association for Restoration of the Environment (CARE) was represented by Charles M. Tebbutt and Elizabeth Mitchell of Western Environmental Law Center, and Richard D. Eymann of Feltman, Gebhardt, Eymann & Jones. Defendants Henry Bosma Dairy, Liberty Dairy, Henry Bosma and Bosma Enterprises were represented by Jerry R. Neal of Preston Gates & Ellis, and John S. Moore of Velikanje, Moore & Shore. The Court having heard the evidence, and having considered the pleadings and the argument of counsel, now enters the following Findings of Fact and Conclusions of Law on the issue of liability.

### I. BACKGROUND

This suit is brought under the citizen suit provision of the Federal Water Pollution Control Act, Clean Water Act (CWA), 33 U.S.C. §§ 1251–1387, and the Washington Clean Water Act, R.C.W. § 90.48. Plaintiff CARE has alleged that Defendants (hereinafter Bosma) have discharged pollutants into the waters of the United States without a permit in violation of 33 U.S.C. § 1311, as well as with a National Pollution Discharge Elimination System (NPDES) permit in violation thereof, and continue to violate their NPDES permit, their Washington State General Dairy Per-

mit (hereinafter included in the term NPDES), the CWA and Washington CWA by discharging animal manure wastes into the waters of the State.

Prior to commencement of trial, the Court resolved the following issues on summary judgment as a matter of law: The Defendants' dairies are Concentrated Animal Feedlot Operations (hereinafter CAFOs). As such, they are point sources subject to the NPDES permit requirement and cannot discharge animal wastes without a NPDES permit or in violation of the NPDES permit they eventually obtained. The CAFOs include not only the ground where the animals are confined, but also the lagoons as well as the equipment which distributes and/or applies the animal waste produced at the confinement area to fields outside the animal confinement area. (Ct.Rec. 147, at 10.)

### Clarification of the Order Granting Partial Summary Judgement

Bosma admits its Dairies are CAFOs and therefore, must obtain a NPDES permit. In order to do so, Bosma had to work with the SYCD and the NRCS to design a DWMP. This was done in 1998. A discharge in violation of the NPDES permit including a discharge as a result of a violation of the DWMP, is a violation of the CWA.

There are two approaches to the issue of what constitutes a discharge violation. First, this Court could broadly interpret a CAFO to include the confinement area, the milk production area, calf pens, as well as waste storage areas, waste and wastewater conveyances including pipes and ditches, storage ponds, and also, equipment used to collect, channel and apply the animal wastes and wastewater, for example, trucks, wheel lines, center pivot irrigation and spray guns. These are all integral parts of the CAFO and the disposition of the huge amounts of animal wastes and wastewater produced by it which pose a risk to the waters of the United States.

However, this Court believes that it is correct to define a CAFO as the confinement area including the milk production area, cow pens, feeding area, truck wash area, calf pens, and fields therein on which manure is stored and any ditches therein. The integral parts of the DWMP including all storage ponds and all devices for conveyance to those ponds as well as all devices for application of animal wastes and wastewater would then be point sources. This would include, but not be limited to, trucks, wheel lines, center pivot irrigation, and spray guns. Any discharge therefrom would be a violation of the NPDES permit and the CWA. By "discharge therefrom", the Court means an overapplication of manure or animal wastewater in violation of the DWMP which causes a discharge to the waters of the United States. This would eliminate the possibility that the CAFOs' crop production fields would be included in the definition of the CAFO. If they were included, then, regardless of the cause or reason, any discharge from them to the waters of the United States would be considered a discharge from a point source. Such an interpretation would conflict with the explicit point source exception for irrigated runoff. *See* 33 U.S.C. § 1362(14) (excepting return flows from irrigated agriculture as point source). It is only where the overapplication of the manure or wastewater to those fields by the CAFO owner or operator or its agents is the cause of the discharge that there is a violation of the DWMP, NPDES permit and the CWA. *See Concerned Area Residents for the Environment v. Southview Farm*, 34 F.3d 114, 115 (2nd Cir.1994). See, *infra,* the discussion regarding the manure deposits at Price/Kellum Road acreage.

Plaintiff CARE can enforce the effluent limitations contained in Washington's "Dairy Farm National Pollution Discharge Elimination System and State Waste Discharge General Permit." (Ct. Rec. 147, at 12.)

The applicable statute of limitations for discharge violations is five years and 60 days back from the filing of the Complaint. (Ct.Rec. 147, at 13.)

Plaintiff CARE provided adequate pre-suit notice of its claims under 33 U.S.C. § 1365(b) and 40 C.F.R. § 135.3. The Notice of Intent to Sue gave sufficient information to the recipients enabling them to identify the location of alleged discharges. The allegation in the Notice that wastewater from lagoons was entering Joint Drain 26.6 (hereinafter J.D. 26.6) was sufficient to enable the recipients to identify Bosma's lagoons as a source of discharge violations and was sufficiently similar to the claims of leaking lagoons that both the letter and spirit of 40 C.F.R. § 135.3(a) were met. Accordingly, the Court had subject matter jurisdiction over the discharges alleged in the Notice. The Court also had subject matter jurisdiction over the alleged violations contained in "Appendix B" of the Complaint because those violations were sufficiently similar to those contained in the Notice. (Ct.Rec.156.) The Court did not have jurisdiction over allegations of violations relating to Price/Kellum and Hanford Highway areas because the Notice of Intent to Sue contained no information which would enable the recipients to identify the acreage at Price/Kellum Road and Hanford Highway as locations of discharge violations as required by 40 C.F.R. § 135.3(a). This ruling was limited to precluding the Plaintiff from seeking penalties for alleged discharge violations at these two locations. The Court expressed no opinion and thereby reserved ruling on whether or not evidence of manure wastes produced at the Bosma dairy farms and applied at these two locations by the Defendants was admissible at trial. (Ct.Rec. 156, at 16.) At trial, after there was undisputed evidence that the Price/Kellum Road acreage was included in the Dairies' Dairy Waste Management Plan as a location for application of manure, the Court allowed evidence of deposit of manure at that location in May of 1998.

## A. Summary of the Court's Findings and Conclusions

For the purpose of establishing a CWA violation, J.D. 26.6, the Sunnyside Valley Irrigation District (SVID) Canal and the Yakima River are "waters of the United States." Any discharge of pollutants by a CAFO into these waters is a violation of the CWA.

The Court affirms it has subject matter jurisdiction to hear this case since the evidence taken at trial confirms that the information provided by CARE to the recipients in the pre-suit notice was sufficient to enable them to identify the locations and dates of the alleged discharges.

The claimed violations of the CWA present a federal question and give the Court jurisdiction under 28 U.S.C. § 1331, and specifically 33 U.S.C. § 1365(a). Additionally, the complaint contained good faith allegations of continuing violations and a reasonable likelihood of recurrent violations which met the *Gwaltney* test for retention of jurisdiction.

The Court finds that CARE, by and through its representatives Helen Reddout and Shari Conant, has standing to sue the Defendants. CARE established (1) an injury in fact, (2) an injury that is traceable to Bosma, and (3) a redressable injury.

At trial, CARE proved that as of the date of the filing of the complaint, January 15, 1998, there was a continuing violation and a reasonable likelihood of recurrent violations of the following: (1) discharges of wastewater from the truck wash to J.D. 26.6, (2) misapplication or overapplication of animal wastewaters to the 14.3 acre field which would flow down the slope east into J.D. 26.6, and (3) a long history of repeated violations resulting from discharges to J.D. 26.6 and the Canal due to operation and maintenance of the Dairies. Accordingly, the Court has Article III jurisdiction. CARE failed to prove continu-

ing violations or reasonable likelihood of recurrent violations relating to Defendants' operating without an NPDES permit and to seepage and capacity of the storage ponds.

Plaintiff established 15 specific violations of the CWA by proving Defendants are persons who discharged or added a pollutant from a point source into "waters of the United States" in violation of their NPDES permit. By the terms of the CWA, Bosma is strictly liable for these violations. The Court finds the Washington Dairy Nutrient Management Act of 1998, R.C.W. § 90.64.030, whatever it's legal efficacy, does not immunize Defendants from violations of the CWA and NPDES permit since Bosma was not in compliance with his Dairy Waste Management Plan nor with the NPDES permit. There is no interpretation of the statute which would shield Bosma from a citizen suit for violations of the CWA. Penalties will be considered in the next phase of the trial on a date to be set by the Court.

## B. *Water Quality Legislation and Congress*

Congressional efforts to deal with the pollution of the waters of the United States has a long history. The Refuse Act of 1899 prohibited the discharge of any "refuse" without a permit from the Secretary of Army (Corp of Engineers) with enforcement by both criminal and civil sanctions. *See* 33 U.S.C. § 407 (superseded by the Federal Water Pollution Control Act Amendments of 1972). According to the report of the Senate Public Works Committee, that authority was ignored until June 1, 1971. *See* S.REP. No. 92–414, at 5 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3672. In 1948, water pollution legislation was enacted with the lead given to the states and support provided by federal agencies. *See* Pub.L. No. 80–845, 62 Stat. 11555. National recognition of water pollution increased gradually in the 1950's and 1960's as additional sources of water pollution were identified.

In 1956, and again in 1965, Congress passed additional legislation on the subject of water pollution to the navigable waters of the United States. In 1970, the federal agency chosen to administer the federal portion of the program was the Environmental Protection Agency. *See* S.REP. No. 92–414, at 1–3 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3669–3670 (general history). The Senate Committee on Public Works conducted a two-year study and concluded "[t]hat the national effort to abet and control water pollution has been inadequate in every vital aspect." S.REP. No. 92–414, at 7 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3674. It expressed concerns that the navigable waters of the United States were severely polluted, specifically mentioning rivers which were being used as waste treatment systems, and found that use unacceptable. *See id.* The Water Pollution Control Act Amendments in 1971 included the NPDES permit system and the right of citizens to file civil suits for violations of that Act. *See id.* at 69 (NPDES), 79 (citizen suits). The citizens were required to first serve a Notice of Intent to file such action on the designated federal and state agencies and the alleged polluter. *See id.* at 79. The citizens then had to wait 60 days. *See id.* This waiting period was required by Congress to allow the parties to confer regarding the alleged violations, conciliate their differences and to allow the alleged violator to correct those alleged violations. Those Amendments also required the EPA Administrator to establish national standards of performance and one of the 28 was "dairy product processing." *Id.* at 58.

These comprehensive revisions of the National Water Quality Policy contained in the Water Pollution Control Act Amendments of 1972 were so important to Congress that they enacted them over the President's veto. *See* S.REP. No. 95–370, at 1 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326, 4327.

By the 1970's, intensive confinement of dairy cows was increasing. In supplemental views in the record of the Senate Public

Works Committee, Senator Robert Dole said,

> Animal and poultry waste, until recent years, has not been considered a major pollutant.... The picture has changed dramatically, however, as development of intensive livestock and poultry production on feedlots and in modern buildings has created massive concentrations of manure in small areas. The recycling capacity of the soil and plant cover has been surpassed.
>
> ....
>
> The present situation and the outlook for future developments in livestock and poultry production show that waste management systems are required to prevent waste generated in concentrated production areas from causing serious harm to surface and ground waters.

S.REP. No. 92–414, at 100 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3761.

In the years following Senator Dole's remarks, the number of dairies adopting intensive confinement procedures for the production of milk increased. One article observed, "[t]he character of livestock production in many parts of the world, however, is changing rapidly and dramatically. Economies of scale, specialization, and regional concentration in all major livestock production sectors have fueled a trend toward fewer, larger operations that confine thousands of animals on limited acreage." Larry C. Frarey and Staci J. Pratt, *Environmental Regulation of Livestock Production Operations*, 9 NAT. RESOURCES & ENV'T. 8, 8, (1995); *see also* U.S. General Accounting Office Pub. No. GAO/RCED–95–200BR, Animal Agriculture: Information on Waste Management and Water Quality Issues 60 (1995).

In 1977, the Senate Committee on Environment and Public Works in Senate Report 95–370, discussed a variety of amendments to the 1972 legislation. *See* S.REP. No. 95–370 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326. These ultimately became the Clean Water Act of 1977. As enacted, the CWA contained an exemption for permit requirements for discharges composed entirely of return flows from irrigated agriculture. *See* 33 U.S.C. § 1362(14). No permit was required under the NPDES **IF** discharges were composed ***ENTIRELY*** of return flow from irrigated agriculture. *See* 33 U.S.C. § 1342(*l*)(1) (emphasis added).

In 1995, there was an effort in the House of Representatives to amend the Clean Water Act by adding to Section 319 the following: "(Q) AGRICULTURAL INPUTS.—FOR THE PURPOSES OF THIS ACT, ANY LAND APPLICATION OF AGRICULTURAL INPUTS, INCLUDING LIVESTOCK MANURE, SHALL NOT BE CONSIDERED A POINT SOURCE AND SHALL BE SUBJECT TO ENFORCEMENT ONLY UNDER THIS SECTION" (as a non-point source). *See* H.R.961, 104th Cong. (1995) (unenacted) (parenthetical added). The 104th Congress took no action on House Bill 961. Had this amendment passed, land application of manure would have been regulated as a non-point source in 33 U.S.C. § 1329.[1] Though the CWA has been amended since its enactment in 1972, Congress' goal remains the same—to eliminate the discharge of pollutants into the navigable water so the United States. *See* 33 U.S.C. § 1251.

## C. State and Local Government Involvement

### 1. Role of Washington Department of Ecology (WADOE)

In Washington, dairies are regulated by a General Dairy Permit and a Dairy Waste Management Plan. Washington is a delegated NPDES permit state which has issued its own general permit. 33 U.S.C. § 1342(b) allows individual states to adopt and administer NPDES programs rather than the EPA. States desiring to adminis-

---

**1.** *See* Jeff L. Todd, Comment, *Environmental Law: The Clean Water Act—Understanding When a Concentrated Animal Feeding Opera-* *tion Should Obtain an NPDES Permit,* 49 OKLA.L.REV. 481, 505 (1996).

ter their own program must develop laws creating and regulating a Dairy Waste Management Program. The State of Washington has delegated regulatory authority to the Department of Ecology ("WADOE") to "[a]dminister and enforce national pollutant discharge elimination system permits for operators of concentrated dairy animal feeding operations, where required by federal regulations and state laws or upon request of a dairy producer." WASH.REV.CODE § 90.64.050(1)(e). Pursuant to RCW § 90.64.050(1), the WADOE also has the duties of identifying existing or potential water quality problems resulting from dairy farms; inspecting a dairy farm upon the request of a dairy producer; receiving, processing, and verifying complaints concerning discharge of pollutants from all dairy farms; determining if a dairy-related water quality problem requires immediate corrective action; and, encouraging communication and cooperation between local department personnel and the appropriate conservation district personnel. *See* WASH.REV.CODE § 90.64.050(1).

WADOE also maintains the lead enforcement responsibility which it cannot delegate. *See* WASH.REV.CODE § 90.64.050(1)(d) & (2). Pursuant to its statutory authority, WADOE has promulgated rules governing the National Pollutant Discharge Elimination System Permit Program, WAC 173-220, and Waste Discharge General Permit Program, WASH.ADMIN.CODE § 173-226.

Pursuant to federally regulated authority, WADOE has adopted a "Dairy Farm National Pollutant Discharge Elimination System and State Waste Discharge General Permit" (Washington general dairy permit) which it issues to CAFOs consisting of dairy operations. *See* WASH.ADMIN.CODE §§ 173-220-010, 173-226-010. WASH.ADMIN.CODE § 173-226-010 authorizes individual or general NPDES permits. Dairy operations that require site specific conditions to protect water quality are issued an individual permit. Under WASH.ADMIN.CODE § 173-220, permits are issued "designed to satisfy the requirements for discharge permits under Sections 307 and 402(b) of the federal Water Pollution Control Act (33 U.S.C. § 1251) and the state law governing water pollution control." WASH.ADMIN.CODE § 173-226-010.

**2. Role of Conservation District:**

Pursuant to RCW 90.64.070(1), the local conservation district has the following duties, contingent upon the availability of funding and resources to implement a dairy nutrient management program:

(a) Provide technical assistance to the department in identifying and correcting existing water quality problems resulting from dairy farms through implementation of the inspection program in RCW 90.64.023;

(b) Immediately refer complaints received from the public regarding discharge of pollutants to the department;

(c) Encourage communication and cooperation between the conservation district personnel and local department personnel;

(d) Provide technical assistance to dairy producers in developing and implementing a dairy nutrient management plan; and

(e) Review, approve, and certify dairy nutrient management plans that meet the minimum standards developed under this chapter.

WASH.REV.CODE § 90.64.070(1).

The local conservation district in this case is the South Yakima Conservation District (SYCD). WADOE referred Bosma to the SYCD for technical assistance in developing a Dairy Waste Management Plan (DWMP), a requirement of the NPDES permit.

## II. JURISDICTION AND STANDING

In a pre-trial ruling, the Court held that it had subject matter jurisdiction over the claims in the Complaint filed by CARE. (Ct.Rec.156). This was based on its finding that the pre-suit notice sent by CARE to Bosma Dairy and the appropriate gov-

ernmental agencies as required by 33 U.S.C. § 1365(b) and 40 C.F.R. § 135.3 gave sufficient information to those recipients enabling them to identify the dates and the locations of the alleged discharges.

## A. *Subject Matter Jurisdiction*

 The evidence taken at trial confirms that the information provided by CARE to the recipients in the pre-suit notice was sufficient to enable them to identify the locations of the alleged discharges. All the discharges alleged in the pre-suit notice and in Appendix B to the Complaint were either to Joint Drain 26.6 (J.D. 26.6) or to the Sunnyside Irrigation District Canal (Canal). J.D. 26.6 runs south along the northeastern border of Bosma's property. At Kirks Road it crosses under the road going southwest to the slope below the 14.3 acre field and then south to the Canal. At the Canal there is a diversion box enabling the SVID to divert the water under the Canal where it would continue down to the Granger Drain and into the Yakima River or into the Canal itself.[2] The Court made a pre-trial visit to the Bosma Dairy in the company of lawyers for each party. J.D. 26.6 can be walked from its southern point on Bosma's property to the northern point on Bosma's property in 15 to 20 minutes. Because of the extensive WADOE history of complaints and verified discharges into J.D. 26.6 by Bosma, both WADOE and Bosma were quite familiar with the location and course of J.D. 26.6 as it ran through Bosma's property.

Bosma had a long history of contacts with WADOE regarding complaints of discharges and verified discharges. He had received Notices of Violation from WADOE which contained dates of alleged violations. Bosma had appealed some of these and had formal hearings followed by written findings which included dates of verified discharges. Additionally, after receiving the NPDES permit in early 1997, Bosma had three additional discharges verified by WADOE and failed to file dis-

charge reports as required by his NPDES permit. That failure made it more difficult for the citizen complainants to discover the dates of those discharges.

The Court reaffirms its ruling that the Notice of Intent to Sue was sufficient to give the Court subject matter jurisdiction.

## B. *Article III Jurisdictions*

### 1. The Gwaltney Requirement

The Supreme Court has recognized that citizen suits under 33 U.S.C. § 1365(a) could not be based on wholly past violations. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 64, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), *on remand,* 844 F.2d 170 (4th Cir. 1988); *rev'd in part,* 890 F.2d 690 (4th Cir.1989). There, the Court held that jurisdiction could be based on continuous or intermittent violations saying of an intermittent polluter, "one who violates permit limitations one month out of every three—is just as much 'in violation' of the Act as a continuous violator." *Id.* at 63, 108 S.Ct. 376.

The case was then *remanded* to the Fourth Circuit to review the district court's finding that citizen plaintiffs made a good faith allegation of ongoing violation sufficient to maintain jurisdiction: at 171. In *Chesapeake Bay Foundation v. Gwaltney of Smithfield, Ltd.,* 844 F.2d 170 (4th Cir.1988), the Court held that it was sufficient to make a good faith allegation of continuing or intermittent violations in order to give the Court initial jurisdiction, but at trial, Plaintiffs had to prove the ongoing violations are intermittent violations. *See* 844 F.2d at 171–72. It held,

Citizen-plaintiffs may accomplish this either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Intermittent or sporadic viola-

---

2. See generally the discussion on navigable waters *infra.*

tions do not cease to be ongoing until the date when there is no real likelihood of repetition.

*Id.*

■ The Court then remanded the case to the district court for specific findings as to whether the citizen-plaintiff had proved the existence of intermittent or sporadic violations constituting an ongoing violation. *Id.* The Complaint filed by CARE contained good faith allegations that there were continuing violations by Bosma and that there was a reasonable likelihood of recurrent violations. This was sufficient to give the Court initial Article III jurisdiction.

## 2. Standing and Mootness

■ Bosma challenges CARE's standing to continue this action asserting that CARE cannot establish (1) an injury in fact (2) an injury that is traceable to Bosma, not some third party, and (3) redressable injury. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Article III requirement of a "case or controversy" requires that a party have standing to pursue or continue the litigation. *See* U.S. CONST. art. III, § II, cl. 1. "Mootness doctrine thus protects defendants from the maintenance of suit under the Clean Water Act based solely on violations wholly unconnected to any present or future wrongdoing, while it also protects plaintiffs from defendants who seek to evade sanctions by predictable 'protestations of repentance and reform.'" *Gwaltney,* 484 U.S. at 66-7, 108 S.Ct. 376 (quoting *United States v. Oregon State Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952)). CARE brings this action asserting "representational standing." "Such 'representational standing' is appropriate where 1) the organization's members would have standing to sue on their own, 2) the interests the organization seeks to protect are germane to its purpose, and 3) neither the claim asserted nor the relief requested requires individual participation by its members." *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals*

*Inc.,* 913 F.2d 64, 70 (3rd Cir.1990) (Aldisert, J., concurring).

■ Within the citizen suit provision of the CWA, a "citizen" entitled to bring suit is defined as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). In order to have individual standing, "Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' ... and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (citations omitted).

■ In *Powell Duffryn,* the defendant made the same argument: the plaintiffs lacked standing to advance their claims. *See Powell Duffryn,* 913 F.2d at 64. The standees in *Powell Duffryn* complained of the same loss of recreational interests about which both Shari Conant and Helen Reddout complained. *See id.* The *Powell Duffryn* standees indicated that their recreational interests of hiking, bird watching, jogging and bicycling along the shores of the polluted body of water were adversely affected and diminished by the pollution. *See id.* at 71. No one actually boated, fished, or swam in the water because of its foulness, but they indicated they would if the water were cleaner. *See id.* Affidavits containing those allegations were held sufficient to satisfy the requirements of Article III. *See id.* Harm to aesthetic and recreational interests is sufficient to confer standing. *See id., see Sierra Club v. Morton,* 405 U.S. 727, at 753, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). "These injuries need not be large, an 'identifiable trifle' will suffice." *Id.* at 71 (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*), 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

### a. Injury in Fact

 Shari Conant is a member of CARE. She works as an office manager in the area and with her husband owns 40 acres of apples and pear trees in the Yakima Valley. While Shari Conant has not rafted in the Yakima River, she would like to and does not because of the pollution in the Yakima River south of the Granger Drain, the Drain into which J.D. 26.6 flows. She has hiked along the Yakima River north of Granger Drain. Her recreation includes bird watching and photography north of Granger in the Toppenish area. The pollution in the Yakima River has prevented her from engaging in activities along the Yakima that she would normally do in a river community in which she lived. Her route to work takes her across the Yakima River at a point just downstream from the Granger Drain. She has noticed an increase in the discoloration and odor of the river in the last few years. Shari Conant believes that the ditches and drains of the SVID are a series of interconnected waterways which contribute to the pollution of the Yakima River. It is her belief based on what she has read, seen and smelled that it is not safe to recreate in and along the Yakima River due to the various entities that contribute pollution to its waters.

Helen Reddout is a 46–year resident of the Yakima River area. She has observed the Yakima River since 1952. Since 1962, she and her husband have owned 75 acres of orchard at Cherry Hill with some 10–12 acres of it along the Yakima River. This property is south of and down-river from the Granger Drain. When water is low, their orchard water is pumped from the Granger Drain. That Drain water clogs their pumps with manure wastewater in spite of filtering. In years past, she and her family liked to picnic at the back end of the orchard along the Yakima River. They would wade in it, float in it, gather wild flowers and vegetables as well as bird watch along it. Her husband used to fish the Yakima River regularly in the 1950's and 1960's. In recent years when they went there, the river smelled like manure, they saw foam on the river and they found dried manure along the banks. This has discouraged recreation by the family in and along the Yakima River which is polluted by a variety of sources.

The Reddout family lives on 1½ acres on Hudson Road in the Liberty area of the Yakima Valley. At their home on Hudson Road, the Reddouts use water from the laterals from the Canal for irrigation. Helen Reddout believes that pollution to J.D. 26.6 which enters the Canal pollutes water in the laterals from the Canal and has reached the lateral which supplies water to their property.

In addition to Helen Reddout's commercial interests being adversely affected, both Helen Reddout and Shari Conant have proven that their recreational and aesthetic interests involving the Yakima River have been severely limited due to the presence of manure flowing into the Yakima River from Granger Drain. These harms are sufficient to establish an injury in fact.

Just as the Court in *Powell Duffryn* found that the interests asserted by the plaintiffs were more than identifiable trifles, so does this Court find that the interests asserted by Shari Conant and Helen Reddout are more than trifles. They have suffered injury-in-fact.

### b. Traceability

 It is Bosma's position that CARE will be unable to prove that the pollutants allegedly found in the Yakima River came from Bosma. The gist of this defense is that even if there was pollution discharged to J.D. 26.6, and even if it was discharged into the Sunnyside Canal, it could not be traced to Bosma because the water of the Canal during irrigation season is applied to other farms along the way and the alleged discharge of pollutants may never even reach the Yakima River. Even if it did reach the river, there are numerous other sources of fecals polluting the waters which are unrelated to Bosma.[3]

3. See concurring opinion of Aldisert J., in *Powell Duffryn, supra*, in which he noted that

Bosma says nothing about the traceability for discharges into J.D. 26.6 during the winter months when it is diverted by the SVID under the then dry Canal to the south into the Granger Drain and from it into the Yakima River. However, CARE does not have to prove that Bosma was the only polluter nor the exact amount of pollution by Bosma.

> The requirement that plaintiff's injury be "fairly traceable" to the defendant's conduct does not mean that plaintiffs must show to a scientific certainty that defendant's effluent, and the defendants effluent alone, caused the precise harm suffered by the plaintiffs. A plaintiff need not prove causation with absolute scientific rigor to defeat a motion for summary judgment. The "fairly traceable" requirement of the *Valley Forge* test is not equivalent to a requirement of tort causation.

*Powell Duffryn*, 913 F.2d at 72 (citations and footnote omitted).

The Fourth Circuit Court of Appeals stated in *Natural Resources Defense Council, Inc. v. Watkins*, that even though

> it seems highly probable that polluters other than the DOE substantially contribute to the current polluted state of the Savannah River. This fact ... does not deprive the affiants ... of standing to sue DOE if it can be shown that the K reactor discharge contributes to the pollution that interferes with the affiants' use of the Savannah River.

954 F.2d 974, 980 (4th Cir.1992).

 Both Helen Reddout and Shari Conant have proven that their recreational and aesthetic interests involving the Yakima River are severely limited by the presence of manure flowing in the Yakima River from the Granger Drain. The Granger Drain empties J.D. 26.6 into the Yaki-

the waters in that case were heavily polluted from a variety of sources but agreed that plaintiff's members had standing. at 87, 89.

4. See the discussion of navigable waters *infra;* see also *United States v. Velsicol Chemical Corp.,* 438 F.Supp. 945 (W.D.Tenn.1976)

ma River. Bosma has discharged manure and animal wastewater into J.D. 26.6 and there is a likelihood that he will continue to do so resulting in an adverse affect upon the ability of Shari Conant and Helen Reddout and their families to use the Yakima River. Bosma points to the fact that others also pollute the Yakima River by discharging animal wastewater and manure into it. That fact is not in dispute. However, it offers no shield to Bosma for his discharges into the "waters of the United States": J.D. 26.6 and the Canal, both of which empty into the Yakima River are included in the definition of "waters of the United States."[4] CARE and its standees do not have to sue every polluter of J.D. 26.6, the Canal, and the Yakima River. It is sufficient if they show that the pollution by Bosma has caused a part of their injury. "The size of the injury is not germane to standing analysis." *Powell Duffryn,* 913 F.2d at 72 n. 8 (citing *SCRAP,* 412 U.S. at 689 n. 14, 93 S.Ct. 2405.) Nor must Shari Conant and Helen Reddout show that the manure and animal wastes that they encountered along the Yakima River or in the Canal were discharged by Bosma. That kind of "scientific certainty" is not required in CWA actions. *See id.* at 72. CAFOs like Bosma are strictly liable for their discharges. The standees need not prove causation as if this were a tort action. It is not. The plaintiffs themselves can recover no damages for their personal injury. *See* 33 U.S.C. § 1365(a) & (d) (stating citizens remedies limited to injunctive relief and civil penalties under section 1319(d), and costs of litigation including attorney and expert witness fees); 33 U.S.C. § 1319(d) (civil penalties); *Gwaltney,* 484 U.S. at 53, 108 S.Ct. 376 (holding civil penalties payable to United States Treasury).

(holding that where the defendant knew or should have known that city sewers, into which it discharged pollutants, led directly into the Mississippi River, that was sufficient to constitute a discharge into "waters of the United States" as that term is used in the Clean Water Act).

Bosma has admitted discharge violations. The WADOE records contain verified discharges by Bosma to J.D. 26.6 and the Canal. The testimony of Ray and Steve Butler proved the ongoing discharge violations by Bosma in 1997, 1998, and 1999. The claims of injury to the recreational and aesthetic interests of Shari Conant and Helen Reddout are proven. Thus, they have traced their injury to the discharge violations by Bosma.

### c. Redressability

 Bosma believes that the CARE standees cannot demonstrate redressability of their injury because they declined to use the Yakima River in its polluted condition or complained that their recreational and aesthetic interests will continue to be limited by the existence of other polluters. Congress answered this by enunciating the purpose of the act which is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," and further by making elimination of pollution of the waters of the United States its national goal. 33 U.S.C. § 1251(a). "Plaintiffs need not show that the waterway will be returned to pristine condition in order to satisfy the minimal requirements of Article III." *Powell Duffryn,* 913 F.2d at 73. Bosma overlooks the deterrent effect on a polluter aware of the award of civil penalties in a citizen's suit brought for violation of the CWA. Other polluters will learn of those awards and will modify their behavior or face the potential for being defendants in citizen suits under the CWA and an award of civil penalties for their discharges in violation of the CWA. The Court concludes that CARE and its members have standing to bring this action and that this Court continues to have Article III jurisdiction.

### III. WATERS OF THE UNITED STATES

These Findings of Fact are based on the Exhibits admitted prior to and during trial and testimony taken.

### A. *Applicable Law*

Waters of the United States or waters of the U.S. means:

(a) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(b) All interstate waters, including interstate "wetlands;"

(c) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, "wetlands," sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters:

　(1) Which are or could be used by interstate or foreign travelers for recreational or other purposes;

　(2) From which fish or shell fish are or could be taken and sold in interstate or foreign commerce; or

　(3) Which are used or could be used for industrial purposes by industries in interstate commerce;

(d) All impoundments of waters otherwise defined as waters of the United States under this definition;

(e) Tributaries of waters identified in paragraphs (a) through (d) of this definition;

(f) The territorial sea; and

(g) "Wetlands" adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) through (f) of this definition.

40 C.F.R. § 122.2.

" 'Surface waters of the state' means all waters defined as 'waters of the United States' in 40 CFR § 122.2 that are within the boundaries of the state of Washington. This includes lakes, rivers, ponds, streams, inland waters, wetlands, ocean, bays, estuaries, sounds, and inlets." Wash.Ad-min.Code § 173–220–030(21).

The Dairy Farm NPDES and State Waste Discharge General Permit issued to H & S Bosma Dairy and Liberty Dairy on January 15, 1998, contained a "FACILITY FACT SHEET." On that sheet, it was explicitly stated that processed wastewater was being discharged to ground water and surface water. The surface water body to which the wastewater was being discharged was identified as an unnamed drain of the Sunnyside Irrigation District which was specifically described in the "water class" category as "Class A."[5]

 Discharges of pollutants into the "waters of the United States" are prohibited by the CWA. 33 U.S.C. § 1311(a). The "discharge of a pollutant" is "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12) & (16). "Navigable waters" are "waters of the United States." 33 U.S.C. § 1362(7). The term "navigable waters" as used in the CWA is "to be given the broadest possible constitutional interpretation." *Leslie Salt Co. v. Froehlke*, 578 F.2d 742, 755 (9th Cir.1978). In *United States v. Saint Bernard Parish*, the Court held that a canal from which waters were occasionally pumped over a levee into adjoining wetlands which were connected by open water channels through the wetland to a bayou and the Mississippi River Gulf Outlet were tributaries of the Gulf and therefore was a "navigable body of water" within the meaning of "waters of the United States" as used in the Clean Water Act. *See* 589 F.Supp. 617 (E.D.La.1984). Accordingly, pollution of that canal was pollution of "waters of the United States" subjecting the polluter to sanctions.[6] Congress clearly intended the broadest possible interpretation of the term "navigable waters" because it used that term with regard to its objective. When enacting the CWA, Congress stated,

> The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of a Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the revisions of this chapter—
>
> (1) it is the national goal that discharge of pollutants into the navigable waters be eliminated by 1985[.]

33 U.S.C. § 1251(a)(1).

As the Court in *United States v. Ashland Oil and Transp. Co.* observed,

> Other congressional concerns with water pollution which extend far beyond wa-

---

**5.** Washington law defines a "Class A" body of water as:

> (2) Class A (excellent).
> (a) General characteristic. Water quality of this class shall meet or exceed the requirements for all or substantially all uses.
> (b) Characteristic uses. Characteristic uses shall include, but not be limited to, the following:
> (i) Water supply (domestic, industrial, agricultural).
> (ii) Stock watering.
> (iii) Fish and shellfish:
> . . .
> (iv) Wildlife habitat.
> (v) Recreation (primary contact recreation, sport fishing, boating, and aesthetic enjoyment).
> (vi) Commerce and navigation.

WASH.ADMIN.CODE § 173–201A–030(2).

For "Class A" waters, "fecal coliform organism levels shall both not exceed a geometric mean value of 100 colonies/100 mL, and not have more than 10 percent of all samples obtained for calculating the geometric mean value exceeding 200 colonies/100 mL." WASH.ADMIN.CODE § 173–201A–030(2)(c)(i)(A).

**6.** *See Bailey v. United States Corp of Eng'rs*, 647 F.Supp. 44, 48 (D.Idaho 1986). The court in *Bailey* broadly construed the term "wetlands". See also, Final General NPDES Permit for Concentrated Animal Feeding Operations (CAFO) in Idaho Id–G–01–0000 (April, 1997) wherein the EPA, Region X, responded to objections to the proposed permit language regarding canals and laterals by saying,

> Canals and laterals which empty into (or connect with) waters of the United States such as rivers, streams, lakes, etc. are themselves waters of the United States in accordance with the definition of waters of the United States in 40 C.F.R. § 122.2(e). As a result, discharges into canals and laterals are considered point source discharges which must be regulated under the NPDES permitting program.

62 Fed.Reg. 20177, 20180 (1997).

ters which are navigable in fact are § 1254(n) dealing with studies of the effects of pollution upon estuaries and estuarial zones, § 1254(p), agricultural pollution, § 1254(q), studies of sewage in rural areas, and § 1255(b), demonstration projects for control of pollution and river basins.

504 F.2d 1317, 1322 (6th Cir.1974).

In recognizing the power of Congress seek to abate pollution under its interstate commerce powers the *Ashland* Court said,

It would, of course, make a mockery of those powers if its authority to control pollution was limited to the bed of the navigable stream itself. The tributaries which join to form the river could then be used as open sewers as far as federal regulation was concerned. The navigable part of the river could become a mere conduit for upstream waste.

*Id.* at 1326.

Similarly, in reaching its conclusion that the canal in its case was included within the definition of "waters of the United States," the *Saint Bernard Parish* Court noted,

Congress intended to control both the discharge of pollutants directly into navigable waters and the discharge of pollutants into non-navigable tributaries which flow into the navigable waters. *Ashland, supra.* The scope of the Act's control to discharge into any waterway where any water which might flow therein could reasonably end up in any body of water, to which or in which there is some public interest. *United States v. Phelps Dodge Corp.,* 391 F.Supp. 1181 (D.Ariz.1975).

*Saint Bernard Parish,* 589 F.Supp. at 620.

The Ninth Circuit has also broadly interpreted the term "waters of the United States" under the Clean Water Act: "[w]e agree with the district court that Congress intended to create a very broad grant of jurisdiction in the Clean Water Act, extending to any aquatic features within the reach of the commerce clause power." *Leslie Salt Co. v. United States,* 896 F.2d 354, 357 (9th Cir.1990).

## B. *Finding of Facts*

The SVID takes water out of the Yakima River at Parker Dam in the Spring of each year. That water runs through the Canal bringing water to the land serviced by the Canal. Water is taken from the Canal and applied to the land by the users. The water going back to the Canal through a series of returns is composed of water not used by irrigators and irrigation runoff. At three locations in the SVID, much of the water in the Canal is returned to the Yakima River. The remaining water in the Canal continues east and then is utilized by a different irrigation district.

J.D. 26.6 of the SVID is a drain that runs south from the ROZA Irrigation District along the east side of Bosma's property then southwest under Kirk's Road and then south through Bosma's property down to the Canal. The SVID has installed a weir box which measures the flow of this drain above the southwestern corner of Bosma's property. The drain then flows into a diversion box just at the northern edge of the Canal. At this box, the SVID can divert the water from this drain under the canal where it continues down to the Granger Drain which empties into the Yakima River. This is done in the winter months when the Canal is empty. During irrigation season, generally from mid-March to mid-October, J.D. 26.6 flows directly into the Canal.

In an attempt improve water quality to meet WADOE requirements, ROZA–Sunnyside Board of Joint Control (hereinafter "RSBOJC") adopted a Water Quality Policy. Consistent with this Policy, RSBJOC water quality personnel collect turbidity readings to measure water clarity. RSJBOC collect water quality samples from over 25 sites. During the irrigation season, the water quality samplings are taken biweekly and then only monthly during the non-irrigation season.

RSBJOC water quality sampling Site 1 measures the water quality of J.D. 26.6 above the Canal at the concrete intake and culvert which is at the base of the Bosma

dairies. This measurement would include waters from J.D. 26.6 that flow from the Bosma dairies and the Cow Palace dairy that borders Bosma's on the east. For each sampling taken since June, 1997 through May, 1999, in which fecal coliform levels were tested, fecal coliform readings at Site 1 ranged between 470 colonies/mL to 650,000 colonies/100mL—each reading above the state water quality standards of 100 colonies/100mL.

Ronald J. Shuck was the drainage supervisor for SVID and had worked there for many years. His deposition testimony was admitted at trial because of his unexpected death prior to trial. Mr. Shuck testified that he and his employees routinely inspected and maintained any joint drains of the SVID north of the Sunnyside Canal. This included J.D. 26.6 which is a joint drain of the ROZA Irrigation District and the SVID.

The SVID and ROZA Irrigation District in its amicus briefs argues against the classification of the waters in the Canal, laterals, and ditches as "waters of the United States" or even "surface waters of the State of Washington." However, "waters of the State" has been broadly interpreted by the Washington Attorney General to include canals, drains, waste ways and reservoirs of irrigation and drainage systems. *See* 4 Op. Att'y Gen. 6 (1969). The Court takes judicial notice that as recently as 1996, the Attorney General of Washington wrote to the regional counsel of the EPA Region X, citing cases which supported that earlier opinion of the Attorney General's office in the State of Washington.

Bosma does not dispute that the Yakima River falls within the definition of "waters of the United States." Nor at any time during the application process or after receiving the Dairy Farm NPDES and State Waste General Discharge Permit did Bosma ever challenge the classification of the receiving surface waters as "Class A."

The waters of J.D. 26.6 empty into the Canal and the Granger Drain and through them to the Yakima River. The Court further finds that the SVID has inspected and maintained J.D. 26.6 above the Canal as it twists through the Bosma Property.

## C. Conclusion of Law

 This Court concludes as a matter of law that J.D. 26.6, the Canal and the Yakima River are "waters of the United States" for the purpose of determining the issue of liability on claims of discharge in violation of the CWA. Accordingly, this Court concludes as a matter of law that any discharges by Bosma to J.D. 26.6 as it traverses his property are discharges to "waters of the United States."

## IV. THE BOSMA DAIRY AND THE LIBERTY DAIRY

### A. History of Operation

In 1973, Henry Bosma started a dairy with 300 dairy cows outside of the town of Zillah in Yakima County. In 1990, the Liberty Dairy was added. Defendants Henry Bosma, Henry Bosma Dairy, Liberty Dairy, and Bosma Enterprises, Inc. own and operate the Dairies at 1271 North Liberty Road and 5680 E. Zillah Road, Granger, Washington. Henry Bosma Dairy is sometimes referred to, and is the same as H & S Bosma Dairy, Hank Bosma Dairy, and Bosma Dairy. Henrietta and Henry Bosma own and operate the dairies, and the land on which manure is stored, collected, and applied, as a sole proprietorship. Bosma and Liberty Dairies (jointly referred to as the Dairies) adjoin one another and are under common ownership. The Cow Palace owns the property that lies immediately to the east of the Bosma Dairy, north of Kirks Road, and south of East Zillah Drive. In February of 1996, Bosma leased 155 acres of land at the northwest corner of the intersection Price and Kellum Road. That land was included in the Dairy Waste Management Plan (hereinafter DWMP) as acreage for application of animal wastes as fertilizer for crop production.

By 1998, according to the approved 1998 DWMP for the Bosma and Liberty Dairies submitted as part of the NPDES permit process, Bosma Dairy had 1,250 milking cows, 250 dry cows, and 750 heifers for a total of 2,250 cows while the adjoining Liberty Dairy had 2,100 milking cows, 400 dry cows, and 500 heifers for a total of 3,000 cows, a combined total of 5,250 dairy cows. The cows are stabled or confined and fed or maintained at the Dairies for a total of 45 days or more in any 12 month period in pens or lots where crops, vegetation, forage growth, or post harvest residues are not sustained. Essentially, both dairies employ intensive confinement for thousands of dairy cows and are "concentrated animal feeding operations" (CAFOs). " 'Concentrated animal feeding operation' means an 'animal feeding operation' which meets the criteria in Appendix B of this part, or which the Director designates under paragraph (c) of this section." 40 C.F.R. § 122.23(a)(3).

An "animal feeding operation" is defined as "a lot or facility (other than an aquatic animal production facility) where the following conditions are met":

(i) Animals (other than aquatic animals) have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12–month period, and

(ii) Crops, vegetation forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot of facility.

40 C.F.R. § 122.23(b)(1).

An "animal feeding operation" is a CAFO under 40 C.F.R. § 122.23 if it confines more than 700 mature dairy cattle (whether milk or dry cows) or 1,000 animal units. See 40 C.F.R. § 122.23(b)(3), 40 C.F.R. Pt. 122, App. B(a)(2)(10). As applied to an animal feeding operation, for dairies the term "animal unit" means the number of mature dairy cattle multiplied by 1.4. 40 C.F.R. Pt. 122, App. B.[7]

Using the formulae in the EPA regulations, 5250 dairy cows converts to 7,350 animal units (the number of dairy cows multiplied by 1.4). See 40 C.F.R. Pt. 122, App. B(a). 1,000 animal units meets the test for qualification as a "concentrated animal feeding operation." See 40 C.F.R. Pt. 122, App. B.

As described in Defendant's Trial Brief (Ct.Rec.159), these Dairies are in operation 24 hours a day, every day of the year, and employ 75 people. The cows are milked three times a day. The management of these dairy wastes is detailed in the 1998 DWMP. In summary, water used to cool the milk is recycled for use in cleaning the animals and milking area. It is then piped to areas where it separates into solids and liquids. It is after which pumped to storage ponds for storage during the winter months and application to crop fields during the growing season. Solid animal wastes are collected from various parts of the confinement area and sold to others as fertilizer, applied to Bosma crop production fields during the growing season, and mixed with straw for use as bedding for the animals. Both dairies presently use a common system of waste collection and disposal. In theory, the confinement area is bermed to channel storm water runoff and any wastewater to storage ponds.

J.D. 26.6 is a drain that runs south from an area at the ROZA Canal along the east side of the Dairies through a culvert under Kirks Road southwest and then south by Storage Ponds # 1 and # 2 to a SVID weir

**7.** It is reported that one dairy cow will produce 82 pounds of wet manure per day. *See* Larry C. Frarey and Staci J. Pratt, *Environmental Regulation of Livestock Production Operations,* 9 Nat. Resources & Env't. 8, 8 (1995). With over 5,000 dairy cows as well as the wastewater from the milking area and runoff from other fields which could carry the manure into the waters of the United States, Bosma had a substantial amount of waste to manage. There were 500 acres specified in the DWMP for application of this manure. This acreage in the 1998 DWMP included all of the acreage at both dairies and acreage leased at the Northwest corner of intersection of Price and Kellum Roads, some four to five miles east.

box and on to a SVID diversion box on the north side of the SVID Canal. In the winter months, J.D. 26.6 is diverted under the Canal and flows south to the Granger Drain and then into the Yakima River. During the growing season, it is diverted into the Canal as added water for irrigation. For years, Bosma used this drain as a conveyance of animal wastewaters to the ponds south of Kirks Road despite being told in 1989 by WADOE officials to cease the use of J.D. 26.6 for that purpose.

Over the years, WADOE, which had responsibility for supervision and enforcement of the CWA and the NPDES permit process, had frequent contacts with Henry Bosma regarding discharges of animal wastewater to the waters of the United States and of the State of Washington from his Dairies and has issued a number of discharge violations to Bosma Dairy. By 1986, Bosma Dairy was under WADOE order to obtain a NPDES permit. In 1987, WADOE and Bosma Dairy entered into a Stipulation to resolve two 1984 discharge violations and the 1986 Order. In return for Bosma's agreement to pay a fine and to take other steps to avoid further discharges, the total fines were reduced and the order to apply for a NPDES permit was held in abeyance on condition that there would be no further discharges from the dairy.

In 1988, following a verified discharge of animal wastes from a spray gun, WADOE recommended an escalated fine and for the second time required Bosma to apply for a NPDES Permit. The enormous amount of animal wastes generated at these industrialized dairies are applied by various methods by dairy owners, operators, or their agents to crop fields which they own or lease. The animal waste is either spread on the fields by trucks or the animal wastewater collected in storage ponds is pumped through a hose to a "wheel line" or a center pivot irrigation line or a powerful "spray gun" and applied to the fields for crop production. If these appliances malfunction or are erroneously operated by the dairy employees, or if the animal wastes are overapplied to the fields for crop production, the animal wastewater may run off the fields, in some cases discharging to waters of the United States.

At some point shortly after WADOE had again ordered Bosma Dairy to apply for a NPDES permit, an advisory committee composed of representatives of the Dairy industry, WADOE, and the EPA began working on the language to be included in the NPDES and Washington State General Dairy Permit. According to Robert Barwin, the water quality manager for WADOE in the central region of the state since 1989, in an effort to develop cooperation and reach consensus on the permit language, WADOE did not require Bosma or any CAFO to apply for and did not issue to any CAFO a general NPDES permit during the years of the development of the NPDES and Washington State General Dairy Permit for Washington dairies. It was not until 1994, some eight years after WADOE first ordered Bosma to apply for a NPDES permit, that the language of the NPDES and Washington State General Dairy Permit was adopted. During those intervening years, WADOE recognized that the absence of a NPDES permit in Washington did not allow CAFOs like Bosma Dairy to violate the CWA by discharging animal wastes to the waters of the United States. When WADOE received and verified complaints of discharge violations by dairy operators in the Yakima area, it referred the dairy operator to the South Yakima Conservation District (hereinafter SYCD) for technical assistance to enable the dairy operator to avoid future discharge violations. As long as the dairy operator was actively engaged in using that technical assistance to correct the problem that led to the discharge violation, WADOE would not prosecute the dairy operator to any penalty or formal enforcement.

In 1993, there were additional verified discharges of animal wastes to J.D. 26.6 on September 30 and October 1. WADOE issued a Notice of Violation to Bosma for these violations. The imposition of a mon-

etary penalty was appealed by Bosma to the Pollution Hearing Control Board of the State of Washington which heard the matter in May and June of 1995, and issued its decision in October of 1995. The penalty assessed in the sum of $3,000.00 was sustained; the remaining $3,000.00 of the penalty was suspended on condition that for three years after October of 1995, the activities at Liberty Dairy would cause no further water pollution violations or violations of the DWMP then in effect.

On April 22 and April 23, 1996, WADOE verified additional discharges to J.D. 26.6 by Bosma. WADOE issued Bosma a penalty order in the amount of $9,000.00 for these additional verified wastewater discharges to J.D. 26.6. In addition, on July 30, 1996, WADOE sent Bosma a letter notifying him that he was required to file an application for a NPDES permit. The reasons for this notice were contained in the letter. Referring to the April 22, 1996, discharge, WADOE wrote the following:

> This incident is similar in nature to other confirmed discharges of manure contaminated waters from the dairy which have periodically occurred since 1976. Due to the close proximity of Drain 26.6 to corrals, pastures, spray fields, feed alleys, and parlors at the Bosma Dairy and to the fact that the drain is used to convey contaminated wastewaters to ponds south of Kirks Road, discharges of manure contaminated wastewaters to waters of the state are likely to reoccur in the future.

(Ex. 48.) On December 13, 1996, Mr. Bosma requested relief from the penalty. Max Linden of WADOE verbally agreed with Bosma that the penalty would be held in abeyance "as long as Henry Bosma works on a management strategy and implements the BMP's (Best Management Plans) and management structures to prohibit manure from being conveyed by the drain through is [sic] dairy into the waters of the State." (Ex. 90.) As directed by Linden, Bosma consulted with Laurie Crowe at the South Yakima Conservation District for assistance in developing the waste management plan.

In late 1996, as required by WADOE, Bosma applied for a NPDES permit for the Bosma Dairy. The H & S Bosma Dairy obtained a Washington general dairy permit on January 31, 1997.

On January 13, 1997, there was an additional discharge by Bosma Dairy verified by WADOE.

In 1996 and 1997, Bosma implemented extensive site improvements in response to pressure from WADOE. In 1997, Bosma constructed a series of storage ponds along the east side of his property as well as Storage Ponds # 1 and # 2 south of Kirks Road. None of the storage ponds were designed by an engineer. Both a representative of the National Resource Conservation Service (NRCS) and Ms. Crowe of the SYCD visited the site on occasion during the construction.

On April 17, 1997, Steven Butler who lives on N. Liberty Road south of Kirks Road reported that the pipe on the Canal from Bosma's property was spilling green-brown manure water into the bottom of the dry Canal. Examining Exhibit 59, a March, 1997, photo of manure in the Canal at that same location, Butler said that the amount in the Canal from the April spill was much deeper, extending across the width of the Canal. He had seen this manure water running into the Canal for a couple of weeks before finally reporting it. He said the color of the water in Exhibit 43(c) was the color of the water he has seen flowing from that same pipe. On several occasions in 1998, and in the spring of 1999, he saw the same manure water spilling into the Canal at the pipe from Bosma's property.

Although now Bosma Dairy was operating with a NPDES permit, WADOE verified additional violations of discharges of pollutants into J.D. 26.6 by Bosma Dairy on July 28, 1997, August 25, 1997, and September 9, 1997. At least one of these violations involved overapplication of animal wastewater to the field east of Storage Ponds # 1 and # 2. WADOE records do

not show any alleged violations after September, 1997.

In the winter months of 1997–1998, Ray Butler, who lives on N. Liberty Road south of Kirks Road near his son Steve, observed six-foot high mounds of frozen manure on the Bosma's field east of Storage Ponds #1 and #2 indicating the winter application of animal wastewater in violation of the NPDES/DWMP.

On October 31, 1997, as required by the CWA, 33 U.S.C. § 1365(a)(1)(A), CARE sent Bosma its first Notice of Intent to Sue letter for violations of the CWA. Sometime after receiving this notice, Bosma and other dairy owners who had received similar Notices had a luncheon meeting at a restaurant with Robert Barwin, the WADOE water quality program manager in the Central Washington region. During this meeting, the Dairy owners and operators requested that WADOE take formal enforcement action against them which they believed would prevent continuation of the suits by CARE. 33 U.S.C. § 1365(b)(1)(B). Barwin testified that he declined to do so because WADOE had made a policy decision that it was going to allocate its enforcement resources in accordance with priorities it had set and would not respond in any way to the filing of citizen suits. In short, if the claims in the citizens' Notices of Intent to Sue involved WADOE enforcement priorities, then WADOE would take action; if not, it would not initiate any action. Barwin explained that until the 1998 amendments to the State Water Quality Act, WADOE lacked the resources to be proactive.

On November 11, 1997, Bosma applied for a NPDES permit for the Liberty Dairy. WADOE had advised Bosma in its July, 1996 Notice that one permit could be used for both dairies since they were adjoining and used some of the same waste management systems if they were under joint ownership.

In a December 23, 1997, letter to Max Linden of WADOE, Bosma wrote: "Also, I need some protection on the November NOV—say $1,000?" (Ex. 95.) This was an effort by Bosma to reach agreement on a specific penalty assessment for the 1997 Notice of Violations. Also in December of 1997, Bosma submitted a Dairy Waste Management Plan for both dairies for approval. On January 15, 1998, the 60–day period having elapsed, CARE filed suit against Bosma. On that very date, quite coincidentally, WADOE issued a modification of the Bosma NPDES permit to include Liberty Dairy. (Ex. 318.)

In early 1998, Bosma visited the Reddout home. Helen Reddout tape-recorded their conversation. While the Court admitted into evidence the tape and a transcript of it, holding the Defendant had waived objection by offering portions of the tape at the pre-trial conference, the Court has made no use of that evidence. (*See* Exs. 346 & 346A).

On January 16, 1998, Holly Cushman of WADOE issued a Recommendation for Enforcement Action against Bosma for the 1997 violations. (Ex. 100.) It contained a history of violations which occurred in 1997, contacts with Bosma and a recommendation for the affirmation of the $9,000.00 penalty for the 1996 violations which had been held in abeyance and the imposition of a total of $3,000.00 for the failure of Bosma to report to WADOE the three verified 1997 violations as required by his NPDES permit. There was no evidence of WADOE action on this recommendation.

The DWMP was approved by the NRCS, the SYCD and Bosma in February of 1998. As approved by Bosma, NRCS and SYCD, the DWMP contained this statement on page 13:

> To be completed:
>
> 1. Currently, wastewater from the vehicle wash area is piped to the SVID drain. This wastewater will be diverted to one of the existing ponds or "catch basins" and the existing pipe to the drain will be capped off.

In May of 1998, several months after this suit was filed on January 15, 1998,

Bosma employees deposited truck loads of manure produced at the Dairies to the Price/Kellum location where it sat for about a month before it was disked into the soil. As deposited, it was spread over a wide area on the property along the side of Price Road with some mounds four feet in height. Some of the liquid material seen along the side of Price Road was leachate from this huge expanse of manure. Both in amount and location, the manure was threat to discharge to any streams close by. Based on photographs and a video taken by Helen Reddout during the time the manure was sitting in these deposits, there was water running under the bridge on Price Road across this property southwest to and under a bridge on Kellum Road.

In the summer of 1998, Bosma completed the installation of two pipes running under Kirks Road which connected the storage ponds above Kirks Road with Storage Ponds # 1 and # 2 south of Kirks Road. There was no blowout of the embankment of the pond above Kirks Road.

During the summer of 1998, and again in the spring of 1999, animal wastewater was sprayed on the field which was identified throughout the trial as the "14.3 acre field." This 14.3 acre field sits west of J.D. 26.6, and on its eastern edge the land slopes down to the J.D. 26.6. The animal wastewater from the wheel line on the 14.3 acre field was sprayed onto Kirks Road and the Golob property on the south side of Kirks Road. Both Ray and Steve Butler, father and son, who live on Liberty Road, south of Kirks Road, observed this. The 14.3 acre field was not bermed and piped to Storage Pond # 2 until late Spring of 1999.

In the fall of 1998, Bosma contacted Harold Porath, a former Dairy Waste Inspector for WADOE, who was then employed by an engineering firm, and asked him to review the DWMP and evaluate the dairy facilities. Porath indicated in an October 12, 1998, letter to Bosma that he had completed the requested evaluation of Wastewater Control Facilities on the Dairies owned by Bosma in Zillah, Washington. (Ex. 146.) That review included Dairy site visits, a review of the NPDES General Permit for both dairies, a review of the Waste Management Plan written by the Natural Resources Conversation Services (NRCS) for both dairies, and discussions with representatives of NRCS regarding the Waste Management Plan. Porath noted that flow from the hop yard to the west of Liberty Road flows to a drain on the west side of Liberty Road and runs east under the road to an open ditch through the middle of a pasture on the Bosma Dairy in proximity to the cow pens. Paragraph 5 of that letter states,

> Runoff from the hop yard located south of the Liberty Dairy and west of the Hank Bosma Dairy currently flows east under Liberty Road, across the pasture on the Hank Bosma Dairy and enters Drain 26.6. Since this runoff flows in an open drain across the pasture on the Hank Bosma Dairy, waste materials applied to the pasture or escaping from the pens located south of the pasture have the potential to commingle with the hop yard runoff and be discharged into Drain 26.6.

(Ex. 146.)

This is similar to the statement found in the dictation based on field notes made by Porath on his September 16, 1998, site visit. (Ex. 147.) The Court notes that Porath also wrote in his dictated field notes, "[a]ccording to Lauri Crowe, South Yakima Conservation District Dairy Waste Resource Technician, neither the Conservation District nor the NRCS designed the new facilities on the HB Dairy and that facility construction was done without cost-share from NRCS." Porath also indicated that he was going to meet with Lauri Crowe at the end of September to review the DWMP. Certain revisions were made to the DWMP in October of 1998, by Lauri Crowe after her meeting with Porath. Those revisions did not contain any amendments, revisions or corrections to

page 13 of the DWMP dealing with the truck wash.

In January of 1999, the John Monks, a hydrogeologist, and Alan Gay, a civil and environmental engineer, experts consulting with CARE, along with Kevin Freeman, a hydrogeologist, an expert consulting with Bosma, and Harold Porath, as well as several members of CARE, and attorneys for both parties visited the Dairies to conduct discovery. During these site visits, Mr. Freeman took certain measurements of the lagoons. Gay and Freeman walked J.D. 26.6 on the Bosma property and took water samples. Gay and Freeman did some bucket tests to determine rate of flow. The embankments of the storage pond above Kirks Road and those south of Kirks Road were observed, as was the land on the west side of J.D. 26.6 north of the Canal. In January, the storage ponds would contain a large amount of animal wastewaters since application to frozen fields in winter months is prohibited by the DWMP. No seepage or evidence of seepage from the storage ponds was observed by any person or expert. There was no credible evidence of erosion of the embankments of the storage ponds observed by any person or expert. Various photos were taken by different individuals during those site visits.

Wastewater samples were taken at four different sites within J.D. 26.6. The first location was the pipe above Kirks Road near the Cow Palace outfall. The next locations were opposite the north and south ends of Pond # 2. The final sample was taken from the flume or weir box opposite Pond # 1. The water samples were tested for fecal coliform, nitrates, ortho-phosphates, total phosphates, ammonia, chloride, conductivity, kjeldahl nitrogen, and nitrite. The results of the water sampling indicate the concentrations of all constituents except for ortho-phosphate, total phosphate and fecal coliforms are consistent over the investigated length of 26.6. Elevated fecal coliform existed during both site visits in the reach adjacent to the lowest lagoons but not above those lagoons. The fecal levels adjacent to and

below the lagoons were consistently above the state standards of 100mL/100 colonies. Detected concentrations of orth-phosphate and total phosphate elevated in the reach adjacent to Pond # 1.

In March of 1999, Richard Haapala, an expert in agricultural engineering, visited the Dairies to consult with Bosma. In April of 1999, Philip Small, an expert in soils sampling and analysis, also visited the Bosma property to consult with Bosma.

All of these experts testified at trial regarding CARE's claim that Storage Ponds # 1 and # 2 were leaking into J.D. 26.6. and the claim that these same storage ponds lacked capacity to comply with the storage requirements of the DWMP and the CWA in that they could not contain the required wastes in the event of a 25–year, 24–hour storm event. Essentially these are claims that there are continuing violations of the CWA/NPDES permit or the likelihood of continuing violations related to these storage ponds.

The Court has in mind the testimony of the witnesses, its review of the exhibits, its determination of the credibility of the witnesses, and the facts as found above and elsewhere herein.

### B. *Continuing Violations*

#### 1. Truck Wash

The Court finds that on January 15, 1998, there was evidence of continuing violation of the CWA due to discharges of wastewater from the truck wash to J.D. 26.6. In 1998, DWMP contained the following paragraph:

To be completed:

1. Currently, wastewater from the vehicle wash area is piped to the SVID drain. This wastewater will be diverted to one of the existing ponds or "catch basins" and "the existing pipe to the drain will be capped off."

(Ex. 97 p. 13)

The Court finds that, even assuming that the drain was capped in March of

1998 as Bosma testified, as of January 15, 1998, the date the Complaint was filed, this condition was a continuing violation of the NPDES permit and of the CWA. However, the Court finds it is probable that if this condition had been corrected as of March of 1998, Bosma would have told Porath whom he hired specifically to review the DWMP *which contained page 13 and this condition to be corrected.* Further, the Court finds that Porath, who was retained in September of 1998, and reviewed both the DWMP and the facilities as requested by Bosma, would have told Crowe about the truck wash when he pointed out certain errors in the DWMP, had he been told of this correction of the condition of the truck wash. In fact, Crowe issued revisions to those pages which needed correction but none were issued for or as to the condition of the truck wash drain which needed to be corrected. Bosma introduced no evidence to support his statement that the truck wash drain was capped in March of 1998. At Bosma's request in May of 1999, just before trial, Crowe issued a revision to this page with a parenthetical added, "(completed in March of 1998)." Crowe relied on Bosma's assertion and did not confirm it independently.

### 2. Misapplication/Overapplication of Wastewaters

The Court further finds that as of January 15, 1998, there was the likelihood of continuing discharges to J.D. 26.6 and therefore violations of the CWA due to the likelihood of the misapplication or overapplication of animal wastewaters to the 14.3 acre field which would flow down the slope east into J.D. 26.6. This field was not bermed and piped to the southern storage ponds until the late spring of 1999 before trial. When the Court conducted a view of the Dairies in late May of 1999, just before trial, the field looked recently bermed and graded to the center of its eastern edge to a pipe in the slope. The testimony of both Butlers who live on adjacent property and have traveled the area along Kirks Road and N. Liberty Road every day for some 20 years was persuasive to this Court that manure wastewater was being applied to the 14.3 acre field and onto adjacent roads and property.

### 3. Operation and Maintenance

The Court also finds that the long history of a variety of repeated violations of the CWA by Bosma resulting from discharges to J.D. 26.6 and the Canal makes it likely that there will be intermittent discharges to J.D. 26.6 and the Canal due to the operation and maintenance of the Dairies. This finding is bolstered by, but does not solely depend on, the testimony of Helen Reddout and the photos and video of the deposits of four foot mounds of manure along the side Price Road and in proximity to water running under both the Price Road and Kellum Road bridges and through the Price/Kellum leased property. To deposit such quantities of manure in such a location with the potential to discharge to waters of the United States, just four months after being sued for CWA violations, is evidence that Bosma was not operating and maintaining the facilities according to the requirement of the CWA nor managing waste as required by his DWMP.

This court allowed evidence of the this incident at the Price/Kellum Road property when it became clear during trial that this property was part of the DWMP and used for application of wastes produced at the Dairies some four miles away. It was then relevant to the issue of whether there was a continued likelihood of discharge violations due to the operation and maintenance of these Dairies. The Court refused to permit CARE to include this as a claimed violation without amending its Complaint. Nothing in the Notice of Claim would have put the recipients on notice of any violation at the Price/Kellum Road location because it was not identified in the Notice as a site of prior discharges nor was this incident sufficiently similar to the claims contained in the Notice to permit its inclusion in this case absent a motion to amend. CARE did send a supple-

mental Notice of this claim to Bosma but never moved to amend its complaint to include this incident.

### 4. Liberty Dairy—Operation without a NPDES Permit

CARE claims that Liberty Dairy was in continued violation of the CWA because it was a CAFO and did not have a NPDES permit on the date of the filing of the complaint, January 15, 1998. The evidence shows otherwise. On that very same date, WADOE issued a modification of the NPDES permit to include Liberty Dairy as Bosma had requested in late 1997. Therefore, as of January 15, 1998, Liberty Dairy had a NPDES permit and was not in continuing violation of the CWA. In Washington, a citizen may not bring suit under the CWA for 60 days after the citizen gives Notice of Intent to Sue to the Administrator of the EPA, WADOE and the alleged violator. *See* 33 U.S.C. § 1365(b). One of the purposes of this sixty-day waiting period is to give the alleged violator "an opportunity to bring itself into compliance with the Act and thus likewise render unnecessary a citizen suit." *Gwaltney,* 484 U.S. at 60, 108 S.Ct. 376. With regard to this claim, Bosma was in compliance with the CWA on the date of the filing of the complaint and therefore, there was no continuing violation nor a likelihood of a continuing violation.

### 5. Storage Ponds and Lagoons

#### a. Seepage to J.D. 26.6

The soil of the area of the Dairies has been studied and its porosity is considered "severe." (Ex. 138). Because of its porosity, the soil needs to be compacted to $10^7$ for use in storage ponds. CARE uses the porosity of the soil as one of its bases for claiming the seepage of animal wastewater from Storage Ponds # 1 and # 2. CARE also points out that there is no evidence that a professional engineer reviewed and approved the construction plans for these two ponds. Various tests were performed by experts for both parties during and

after the site visits of January, 1999. Gay and Freeman had the water samples taken from J.D. 26.6 analyzed by the same laboratory, although Freeman had a more extensive test done. Using the same water samples and laboratory they came to different conclusions based on those results, observations during the site visits and review of various materials. Gay relied on the fecal coliform, phosphate and orthophosphate results to support his theory that the storage ponds were seeping underground to J.D. 26.6 via macropores or "piping." Freeman compared the fecal coliform results to the other results, specifically the chloride results, and concluded the ponds were not the source of the fecal coliform in J.D. 26.6. In sum, the presence of chloride was essentially uniform at all four test locations. Freeman opined that given the character of chloride to freely travel, had there been underground seepage from Storage Ponds # 1 and # 2, there would have been increased amounts of chloride at the testing locations in J.D. 26.6 parallel to those ponds. The analysis of the water samples did not demonstrate that.

Mr. Freeman also conducted a "bucket test" as a rough field test for the flow rate of J.D. 26.6 at several locations and concluded that there was no appreciable difference in flow rate at different points in J.D. 26.6. Philip Small, an expert on soils analysis, walked the length of J.D. 26.6 at the Dairies observing the ponds and catch basins' embankments. He probed the exterior walls of the embankments of Storage Ponds # 1 and # 2 and Catch Basin 1 north of Kirks Road with a ¼ inch rod topped with a ⅜ inch ceramic ball to see if there was any collapse or breakthrough of the soil which would indicate "piping." He found none. Monks used a Global Positioning System device to measure the area of the storage ponds and the surface area of those ponds. Some tests, like a dye test, were not performed by CARE due to the length of time to conduct such tests and the expense.

In addition, there is no evidence critical of the construction of these storage ponds. The uncontradicted testimony of Bosma is that representatives of both NRCS and the SYCD visited during construction. Laurie Crowe of the SYCD agreed that she saw nothing in the manner of construction that appeared to violate NRCS standards. Both organizations signed and approved the 1998 DWMP which specifically identified the enlargement of these ponds in Section 7, "ADDITIONAL IMPROVE-MENTS." There was other uncontradicted testimony by Bosma that a person with years of experience in construction of storage ponds constructed the ponds. No expert who testified conducted any tests establishing the compaction of the soil in the embankments, assuming such tests exist. There is no evidence that WADOE or EPA required that a professional engineer design these storage ponds. There is also no evidence that Bosma did not comply with standards that did apply to the design and construction of these storage ponds. Parenthetically, there is no evidence that any government health agency was required to approve the design, location, or construction of these storage ponds. Based on the porosity of the soils at the Dairies, CARE's experts questioned their suitability for use in constructing these storage ponds. However, absent tests confirming the lack of appropriate compaction of soils in the embankments and absent any evidence of the violation of any applicable construction standards, and given the conflicting expert conclusions based upon the analyses of the water samples, as well as the approval of the DWMP by both the NRCS and the SYCD, the evidence is simply insufficient to prove to a reasonable probability that the storage ponds were the source of the fecal coliform in J.D. 26.6 at the time of the water quality sampling in January of 1999, or that they will be in the future.

### b. Capacity of Storage Ponds

CARE claims the capacity of storage ponds of the Dairies is insufficient to withstand a 25–year, 24–hour storm event as required by 40 C.F.R. § 412.13(b). This guideline requires a CAFO to be designed, constructed, and operated to contain all process generated wastewaters plus the runoff from a 25–year, 24–hour rainfall event. CARE argues that the DWMP incorrectly used 1.6 inches of rain for a 25–year, 24–hour storm event and that the correct figure is actually 2.5 inches based on calculations testified to by Alan Gay. Alan Gay, using his calculations and those of Kevin Freeman, concluded that the storage capacity of the Dairies was inadequate. Ms. Crowe of the SYCD who prepared the DWMP obtained the figure of 1.6 inches from the Prosser Resource Station. That is the same figure used by the NRCS maps for rainfall at the Dairies. Ms. Crowe also testified that she used the T55 NRCS software program which is the standard program to be used for these capacity calculations and that based on these calculations, the Dairies have adequate capacity to withstand a 25–year, 24–hour storm event. Alan Gay overestimated the acreage of the Dairies which would contribute water to the storage ponds. Based on the evidence, the Court finds that CARE has failed to prove that the Dairies lack the storage capacity to contain a 25–year, 24–hour storm event. Accordingly, CARE has failed to prove a continuing violation or the likelihood of a continuing violation on this claim.

## V. CONCLUSIONS OF LAW

### A. *The Washington Dairy Nutrient Management Act of 1998*

 Bosma believes that this act provides him with immunity from citizen suits provided he has a NPDES permit and a Dairy Waste Management Plan and is in compliance with both. This position is set out in the Defendant's Trial Brief (Ct.Rec. 159). The Washington statute provides:

> This section specifically acknowledges that if a holder of a general or individual national pollutant discharge elimination system permit complies with the permit and the Dairy Nutrient Management

Plan's conditions for appropriate land application practices, the permit provides compliance with the Federal Clean Water Act and acts as a shield against citizen or agency enforcement for any additions of pollutants to waters of the state or of the United States as authorized by the permit.

WASH.REV.CODE § 90.64.030(8) (1990).

Neither party has briefed this matter with an analysis of the legislative history, comparable state statutes, comparable statutes from other states, or an analysis of federal precedents dealing with similar state statutes. The Court expresses no opinion on legal efficacy of this statute as a defense to a CWA claim. It is sufficient to say that this Court finds that Bosma was not in compliance with his Dairy Waste Management Plan nor with the NPDES Permit. On its very face, the DWMP clearly indicates, on page 13, that wastewater from the truck wash is being discharged to J.D. 26.6. Additionally, the deposits of a four-foot high bed of manure along Price Road in May of 1998, and the misapplication of animal wastewater to the 14.3 acre field causing the discharge to J.D. 26.6 in 1998 and 1999, have been proven by a preponderance of the evidence. While Bosma may have possessed a NPDES permit and a DWMP, he was not in compliance with them. With these facts, there is no interpretation of that subsection, whatever its legal efficacy, which would shield Mr. Bosma from a citizens suit for violations of the CWA. Bosma is a CAFO and a CAFO may not discharge except as a result of a 25 year, 24-hour storm event.

## B. Violations

To establish a violation of the CWA, Plaintiffs bear the burden of proving that (1) Defendants are "person[s]," (2) who "discharged" or "added," (3) a "pollutant," (4) from a "point source," (5) into "waters of the United States," (6) and the discharge was not authorized by a NPDES permit. *See* 33 U.S.C. §§ 1311(a) & 1342; *Committee to Save Mokelumne River v.*

*East Bay Util. Dist.*, 13 F.3d 305, 308 (9th Cir.1993) (listing and discussing elements).

CARE proved Defendants are persons who discharged pollutants (wastewater and manure) from a point source (CAFO, spray guns, truck wash, wheel lines, and other discrete conveyances) into waters of the United States (J.D. 26.6) in violation of their NPDES permit.

### 1. Proven Violations

Based on the testimony of Harold Porath, Robert Barwin, Max Linden, Greg Schuler, James Trull, Holly Cushman, Ray Latham, Henry Bosma, Laurie Crowe, Ray Butler, Steven Butler, Michael Tedin; deposition testimony of Ronald Shuck; Bosma's Response to Plaintiff's First Request for Admissions (Ex. 117); and exhibits admitted prior to and during trial, the Court finds the following violations occurred for which Defendants are strictly liable:

1. *September 30, 1993:* Bosma admitted they discharged manure wastewater from the sprayfield into J.D. 26.6 because procedures designed to prevent overapplication failed due to an employee leaving work early to attend to a family emergency without shutting equipment off. (Exs.24–27, 29–38, 41–42, 152.)

2. *October 1, 1993:* Same event continuing as September 30, 1993. *Id.*

3. *December 1, 1993:* Bosma admitted a discharge of wastewater into J.D. 26.6. (Ex. 117, ¶ 29.)

4. *January 20, 1995:* Upon investigation of a January 17, 1995, complaint of violation, WADOE employee McKinney personally observed a leaking sprinkler line discharging wastewater into J.D. 26.6. (Ex. 40.)

5. *April 22, 1996:* Bosma admitted and WADOE verified after a complaint received on April 19, 1996, that a manure wastewater discharge into J.D. 26.6 occurred because an employee failed to switch the valve transfer ditch to check

runoff from pasture of application. (Exs. 43–48; 117, ¶ 39; 100.)

6. *April 23, 1996:* Bosma admitted they overapplied manure waste to agricultural land which resulted in a discharge of manure waste in J.D. 26.6. (Ex. 117, ¶ 40.)

7. *January 13, 1997:* Bosma admitted and WADOE verified after receipt of a complaint that a discharge of manure wastewater into J.D. 26.6 occurred because of a breach in a new, unfinished lagoon that was under construction. (Exs. 50; 52–53; 117, ¶ 42.)

8. *April 17, 1997:* Steven Butler testified that he reported a discharge to WADOE. Specifically, he stated that the pipe on the Canal from Bosma's property was spilling green-brown manure water into the bottom of the dry Canal. WADOE did not investigate the claim.

9. *April 17, 1997:* Defendant violated Condition S5.B. of the general dairy permit by not reporting the discharge to WADOE.

10. *July 28, 1997:* After receiving a complaint, WADOE employee Ray Latham personally observed and verified that overapplication of irrigation runoff contaminated with manure had eroded an area between the lagoon and SVID canal. The runoff was bypassing the lagoon and entering J.D. 26.6. (Exs.73, 74, 90, 94, 100.)

11. *July 28, 1997:* Bosma violated Condition S5.B. of the general dairy permit by not reporting the discharge to WADOE. (Ex. 100.)

12. *August 25, 1997:* Bosma admitted, and after receipt of a complaint WADOE verified, that a pipe to the newest lagoon was plugged, resulting in contaminated wastewater discharging into J.D. 26.6. (Exs. 79; 80; 81; 90–91; 93; 100; 117, ¶ 73.)

13. *August 25, 1997:* Bosma violated Condition S5.B. of the general dairy permit by not reporting the discharge to WADOE. (Ex. 100.)

14. *September 9, 1997:* Bosma admitted, and after receipt of a complaint WADOE verified, that a piece of sheet metal was blocking the intake to the lower lagoon and diverting contaminated wastewater to J.D. 26.6. (Exs. 82–89; 90–91; 100; 117, ¶ 73.) WADOE employees collected samples of liquids flowing in J.D. 26.6 below the discharge location which indicated fecal coliform levels were greater than 48,000/100mL.

15. *September 9, 1997:* Bosma violated Condition S5.B. of the general dairy permit by not reporting the discharge to WADOE. (Ex. 100.)

### 2. Alleged Violations Not Proven

The Court heard testimony regarding the following dates for which the Plaintiff failed to meet its burden of proof sufficient to establish violations: March 26, 1993; March 31, 1993; June 9, 1993; January 17, 1995; April 19–21, 1996; January 14–16, 1997; January 23, 1997; February 24–25, 1997; March 3–4, 14–16, 21–23, 28–30, 1997; April 4–6, 11–13, 17, 1997; May 27, 1997; June 23, 1997; July 25–27, 1997; August 1, 1997; unspecified dates in August and September, 1998.

### C. *Conclusion*

Bosma is strictly liable for fifteen violations of the CWA. CARE has proven that Bosma continues to violate the CWA and that there is a likelihood that there will be recurrent violations at the Bosma Dairies.

The trial on penalties will be held on a date in the fall of this year to be determined in a scheduling conference call with counsel.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this order and to provide copies to counsel.