**COMMUNITY ASSOCIATION FOR RESTORATION OF THE ENVIRONMENT, a Washington nonprofit corporation, Plaintiff–Appellee,**

v.

**HENRY BOSMA DAIRY, a Washington proprietorship aka Hank Bosma Dairy aka Bosma Dairy aka H & S Dairy aka H & S Bosma Dairy aka B & M Dairy; Liberty Dairy, a Washington proprietorship; Henry Bosma, owner and operator, Defendants–Appellants.**

*Community Association for Restoration of the Environment, a Washington nonprofit corporation, Plaintiff–Appellant,*

v.

**Henry Bosma Dairy, a Washington proprietorship aka Hank Bosma Dairy aka Bosma Dairy aka H & S Dairy aka H & S Bosma Dairy aka B & M Dairy; Liberty Dairy, a Washington proprietorship; Henry Bosma, owner and operator, Defendants–Appellees.**

Nos. 01–35261, 01–35351.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 3, 2002.

Filed Sept. 16, 2002.

Charles M. Tebbutt, Eugene, OR, Richard C. Eymann, Eymann, Allison, Fennessy, Hunter & Jones, P.S., Spokane, WA, for plaintiff-appellee-appellant Community Association for Restoration of the Environment.

Jerry R. Neal, Spokane, WA, for defendants-appellants-appellees Henry Bosma Dairy, et al.

Before: REAVLEY,* BRUNETTI and TROTT, Circuit Judges.

BRUNETTI, Circuit Judge.

This case arises from claims that two dairies discharged pollutants into navigable waters of the United States without a permit and in violation of water quality standards. We are called upon to decide two central issues.[1] First, we must determine whether under the citizen suit provision of the Clean Water Act (CWA), 33 U.S.C. §§ 1251–1387 (2001), the plaintiffs' 60–day notice letter adequately notified the defendants of alleged violations. Second, we must determine whether the district court erred by concluding that ongoing violations existed. The district court resolved both questions in favor of the plaintiffs and imposed penalties for 16 proved violations. We affirm.

## BACKGROUND

The complaint filed by plaintiff Community Association for Restoration of the Environment ("CARE") alleges that defendants Henry Bosma Dairy, Liberty Dairy, Henry Bosma and Bosma Enterprises ("Bosma") operated and discharged pollutants without a National Pollution Discharge Elimination System ("NPDES") permit. The complaint further alleged that the discharges were of a type which would not be allowed even with a NPDES permit. The complaint also claimed that Bosma discharged pollutants in violation of the Washington General Dairy NPDES permit.

It is unlawful to discharge any pollutant into the United State's waters except those discharges made in compliance with the CWA. See 33 U.S.C. § 1311(a). In order to lawfully discharge a pollutant, a NPDES permit must be obtained. 33 U.S.C. § 1311(a), 1342(a). A NPDES permit allows the holder to discharge pollutants at levels below thresholds incorporated in the permit. 33 U.S.C. § 1342(a); 40 C.F.R. § 122.1 et seq.

Bosma owns and operates two dairies, the Bosma and Liberty Dairies, in the Yakima Valley, in the central part of Washington. The dairies are adjacent to one another and consist of four large parcels of property.[2] The dairies stable or

---

* The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

1. The parties raised other issues on appeal, as well as a cross-appeal, which have little merit and are briefly addressed later.

2. According to the 1998 Dairy Waste Manage-

confine approximately 2500 and 3000 dairy cattle. The dairies are supposed to be set up so that waste produced by the dairies is contained and stored in a lagoon. Bosma's permit states that the dairies may utilize dry storage and lagoon or waste pond storage for manure and farm waste. The dairies' total waste capacity is 3 months at 4,770,00 volume. One-hundred fifty acres are used for wastewater field application. With more than 5000 cattle, the dairies operate a "concentrated animal feeding operation" ("CAFO"). CAFOs are animal feeding operations where animals are stabled or confined for a total of 45 days or more in any 12 month period in an area where neither crops, vegetation or crop residue is sustained. 40 C.F.R. § 122.23(c)(3). As a CAFO, Bosma is subject to "effluent guidelines", 40 C.F.R. § 412.12(a), and is considered to be engaged in industrial activities. 40 C.F.R. § 122.26(b)(14)(i) & (v). Therefore, Bosma must obtain an individual permit for storm water discharges. 33 U.S.C. § 1342(p)(2)(B); Wash. Admin. Code §§ 173.220.020 & 173.220.040.

Bosma has a long history of compliance problems. Soon after Bosma began operating the Hank Bosma Dairy in 1973, Washington's Dep't of Ecology ("WADOE") cited Bosma for discharging manure waste to Joint Drain 26.6 (J.D. 26.6). J.D. 26.6 starts above and runs "along the east side of Bosma's property then southwest under Kirk's Road and then south through Bosma's property down to the [Sunnyside Valley Irrigation] Canal" (Canal) and then to the Yakima River. *CARE v. Bosma Dairy, et al.*, 65 F.Supp.2d 1129, 1144 (E.D.Wash.1999). J.D. 26.6 discharges into the Canal during irrigation season,

and into the Granger Drain which empties into the Yakima River during non-irrigation season. A diversion box in J.D. 26.6 uses wooden boards to direct flow to either the Canal or the Granger Drain. In 1976, WADOE directed Bosma to obtain a NPDES permit. Bosma ignored this request. WADOE repeated this request in 1978, 1986, and 1996. Each time Bosma refused. Over this period of time, WADOE received several complaints of discharge into the J.D. 26.6 drain and also cited Bosma for verified discharges into J.D. 26.6.

On January 31, 1997, Bosma was issued a General Dairy Permit for the Bosma Dairy. Pursuant to federal law, the state of Washington has adopted a Washington General Dairy Permit which it issues to CAFOs consisting of dairy operations. *See* Wash. Admin. Code §§ 173–226–010 (2002). At Bosma's request the permit was modified to include both the Bosma and Liberty Dairies on January 15, 1998, the same day CARE filed its complaint. Pursuant to the CWA, a state is authorized to create and administer its own permit program, provided that program meets the requirements established by the CWA and is approved by the EPA. 33 U.S.C. § 1342(b). In Washington, dairies are regulated by a General Dairy Permit and a Dairy Waste Management Plan ("DWMP"). WADOE administers and enforces permits for "operators of concentrated dairy animal feeding operations, where required by federal regulations or state law or upon request of a dairy producer." Wash. Rev.Code § 90.64.050(1)(e) (West 2002). WADOE has the lead enforcement responsibility.[3]

ment Plan ("DWMP") submitted as part of the NPDES permit process, Bosma dairy had 1,250 milking cows, 250 dry cows, and 750 heifers for a total of 2,250 cows. Liberty

Dairy had 2,100 milking cows, 400 dry cows, and 500 heifers for a total of 3,000 cows.

3. WADOE also identifies existing or potential water quality problems from dairy farms, in-

Pursuant to federal regulations, WA-DOE adopted a Dairy Farm National Pollutant Discharge Elimination System and State Waste Discharge General Permit (Washington general dairy permit) which it issues to CAFOs. Wash Admin. Code § 173–220–010, 173–226–010 (2002). A dairy can seek an individual or general NPDES permit. Dairy operations that require site specific conditions to protect water quality are issued an individual permit. Pursuant to Washington Revised Code § 90.64.070(1), the local conservation district provides assistance to the department and dairy producers in implementing a dairy nutrient management program.[4] The local conservation district in this case is the South Yakima Conservation District ("SYCD"). WADOE referred Bosma to the SYCD for technical assistance in developing a DWMP, which is required for the NPDES permit. The Washington General Dairy Permit issued to Bosma states with regard to surface water effluent limitations:

There shall be no discharge of process waters to surface waters of the state, except for overflow from facilities designed, constructed and maintained to contain process waste unless such a discharge is due to or a direct result of a twenty-five-year, twenty-four-hour rain fall event for that location. This permit does not authorize any discharge of process waste that would result in the violation of State Surface Water Quality Standards.

If a citizen believes that an entity has violated either the Act, the limitation of its permit, or both, federal law allows the citizen to bring suit against the alleged violator.

On October 31, 1997, CARE sent Bosma a 60 day notice of its intent to sue Bosma under the citizen suit provision of the federal CWA. The notice advised Bosma of CARE's intent to sue for 12 alleged illegal discharges. On January 15, 1998, CARE filed its complaint seeking civil penalties for the 12 violations as well as for 32 alleged violations set forth in an appendix to the complaint ("Appendix B"). CARE's complaint alleged three counts: (1) operation and discharge without a NPDES permit; (2) discharges in violations of the Washington General Dairy NPDES permit; and (3) discharges causing violations of water quality standards.

The district court resolved the following issues on summary judgment which relate to this appeal:

- CARE provided adequate pre-suit notice of its claims under 33 U.S.C. § 1365(b) and 40 C.F.R. § 135.3. The court held that it had subject matter jurisdiction over the alleged violations contained in Appendix B of the

---

spects dairy farms upon request of a producer or citizen complaints, determines if a problem requires immediate corrective action, and facilitates cooperation between local and district personnel. Wash. Rev.Code § 90.64.050(1).

4. The local conservation district has the following duties:

(1) Provide technical assistance to the department in identifying and correcting existing water quality problems resulting from dairy farms through implementation of the inspection program in RCW 90.64.023;

(2) Immediately refer complaints received from the public regarding discharge of pollutants to the department;

(3) Encourage communication and cooperation between the conservation district personnel and local department personnel;

(4) Provide technical assistance to dairy producers in developing and implementing a dairy nutrient management plan; and

(5) Review, approve, and certify dairy nutrient management plans that meet the minimum standards developed under this chapter.

Wash. Rev.Code § 90.64.070(1).

complaint because those violations were sufficiently similar to those contained in the Notice.

- The court had no jurisdiction over allegations of violations relating to Price/Kellum and Haford Highway because the Notice contained no information which would enable Bosma to identify those areas as locations of discharge violations. The court limited this ruling to precluding CARE from seeking penalties for alleged discharges at these locations. However, the court expressed no opinion and reserved ruling on whether evidence of manure wastes produced and applied at these locations was admissible at trial.

- Bosma's dairies are CAFOs. Thus, they are point sources subject to the NPDES permit requirement and cannot discharge animal waste without such a permit or in violation of an NPDES permit. The CAFOs include the ground where the animals are confined, the lagoons and any equipment used to distribute or apply the animal waste product at the confinement area.

- CARE can enforce the effluent limitations contained in Washington's Dairy Farm National Pollution Discharge Elimination System and State Waste Discharge General Permit.

*Community Ass'n for Restoration of Environment (CARE) v. Sid Koopman Dairy*, 54 F.Supp.2d 976 (E.D.Wash.1999).

After the liability portion of the trial, the court found that CARE proved 16 violations. The district court found "that as of the date of the filing of the complaint, January 15, 1998, there was a continuing violation and a reasonable likelihood of recurrent violations of the following: (1) discharges of wastewater from a truck wash to J.D. 26.6, (2) misapplication or overapplication of animal wastewaters to a 14.3 acre field which would flow down the slope east into J.D. 26.6, and (3) a long history of repeated violations resulting from discharges to J.D. 26.6 and the Canal due to operation and maintenance of the Dairies." The court did find, however, that CARE failed to prove continuing violations or reasonable likelihood of recurrent violations relating to Bosma's operating without an NPDES permit and to seepage and capacity of the storage ponds.

In the penalty phase of the trial, the court ordered Bosma to pay $171,500 in civil penalties. The court awarded CARE attorney's fees in the amount of $428,000. Bosma appeals the district court's order. In addition, CARE appeals the court's award of attorney's fees and penalties imposed.

CARE alleged subject matter jurisdiction in the federal district court based on 33 U.S.C. § 1365(a)(1)(A) and 28 U.S.C. §§ 1331, 1367. Bosma contested the district court's subject matter jurisdiction. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

■ We review de novo the district court's conclusion that CARE's 60 day notice was adequate. *Natural Res. Def. Council v. Southwest Marine, Inc.*, 236 F.3d 985, 996 (9th Cir.2000).

### I. Notice

### A. Statutory Requirements

We first turn to the statutory requirements particular to the citizen suit provision of the CWA. Under the CWA private citizens may sue any person alleged to be in violation of the conditions of an effluent standard or limitation under the Act or of an order issued with respect to such a standard or limitation by the Administra-

tor of the Environmental Protection Agency (EPA) or any state. *See* 33 U.S.C. § 1365(a)(1). Citizens may not bring suit until they have given 60 days' notice of their intent to sue to the alleged violator, as well as to the Administrator and the state in which the alleged violation occurs. 33 U.S.C. § 1365(b)(1)(A). The CWA does not describe the content of the required notice, but directs that "[n]otice ... shall be given in such a manner as the Administrator shall prescribe by regulation." 33 U.S.C. § 1365(b). The EPA has adopted such regulation, which mandate as follows:

> Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to constitute a violation, the person or persons responsible for the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a). The Supreme Court has interpreted this notice requirement as serving two purposes: "to give [the alleged violator] an opportunity to bring itself into compliance with the Act and thus likewise render unnecessary a citizen suit." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 60, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

### B. Caselaw

In a series of cases beginning with *Hallstrom v. Tillamook County*, 493 U.S. 20, 26, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989), courts have attempted to clarify the citizen suit notice requirement and have strictly construed the requirements listed in the EPA guidelines. In *Hallstrom*, the Court held that the district court lacked subject matter jurisdiction over the plaintiffs' action because the plaintiffs had failed to give any notice to the EPA or the appropriate state agency. *Id.* at 33, 110 S.Ct. 304. Although *Hallstrom* did not speak directly to the issue of what constitutes sufficient notice under the applicable regulation, a number of courts have found guidance in the *Hallstrom* court's rationale for strict interpretation of environmental statute notice requirements. In *Washington Trout v. McCain Foods, Inc.*, 45 F.3d 1351, 1354 (9th Cir.1995), we interpreted *Hallstrom* to require strict compliance with all aspects of the notice requirement set out by the EPA and held that the plaintiffs' failure to include their identities, addresses, and phone numbers in the notice letter required dismissal of the suit. *Id.; Atwell v. KW Plastics Recycling Div.*, 173 F.Supp.2d 1213, 1222 (M.D.Ala.2001) (interpreting the notice requirement strictly); *Cal. Sportfishing Prot. Alliance v. City of Sacramento*, 905 F.Supp. 792, 799 (E.D.Cal.1995) (concluding that monitoring and effluent violations are distinct and that the plaintiff must give notice of each because imprecise notice does not fulfill purpose of notice requirement).

■ However, in recent years some courts have taken a more liberal interpretation of the notice requirements. The Third Circuit, the only circuit to have considered the adequacy of a citizen—suit notice which failed to include additional violations listed in the complaint as that at issue here, held that a citizen plaintiff's initial notice of discharge violations was broad enough to encompass additional discharge, monitoring, reporting, and record keeping violations occurring during and after the date of the notice letter. *Pub. Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir.1995). These claims, however, have to be of the same "type." *Id.* at 1250; *see also, Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 355 (8th Cir.1998)

(agreeing with *Hercules* that a "citizen suit is limited to violations that are closely related to and of the same type as the violations specified in the notice of intent to sue"). Although the notice must be sufficiently adequate so that the recipients can identify the basis for the complaint, "the citizen is not required to list every specific aspect or detail of every alleged violation. Nor is the citizen required to describe every ramification of a violation." *Hercules*, 50 F.3d at 1248. *Hercules'* "overall sufficiency" approach focused on the purpose of the notice requirement "to provide the recipient with effective, as well as timely notice." *Id.; Atl. States Legal Found. Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir.1997) (stating that the notice must be sufficiently detailed to allow the alleged violator to know what it is doing wrong so that it will know what corrective actions will prevent a lawsuit). Like in *Hercules*, the plaintiffs' complaint listed violations that were not specifically listed in the notice.

 As in *Hercules*, CARE's notice satisfies the goals of the CWA's citizen suit provision. The notice must include

> sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to constitute a violation, the person or persons responsible for the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a). Following the rule of "strict compliance" we are unable to discern any failure on CARE's part to satisfy the statutory requirements. CARE's notice included all of the information required by the EPA regulations. Neither the CWA nor the EPA's regulations require plaintiffs to provide an exhaustive list of all violations. *See, e.g., Atlantic States*, 116 F.3d at 820 (holding

that plaintiff's notice of specific violations at defendant's outfall 3 was sufficient to encompass later violations at outfall 4 when the defendant's actions—rerouting to outfall 4—showed that the notice provided the defendant with sufficient information to correct the violation). The key language in the notice regulation is the phrase "sufficient information to permit the recipient to identify" the alleged violations and bring itself into compliance.

CARE's notice letter listed the following violations:

> Illegal discharges occurred on at least the following dates:

| | |
|---|---|
| 1/22/92 | liquid manure discharge into irrigation drainage ditch |
| 3/26/93 | manure discharge into agricultural return drain |
| 3/31/93 | manure wastewater discharge to SVID 26.6 |
| 12/1/93 | manure wastewater into SVID drain 26.6 |
| 6/9/93 | manure discharge into drain |
| 9/30/93 | manure wastewater discharged from spray-field into SVID 26.6 drain |
| 10/1/93 | manure wastewater discharged from spray-field into SVID 26.6 drain |
| 4/22/96 | manure wastewater discharge to SVID 26.6 |
| 1/15/97 | manure wastewater discharge by application to frozen ground and runoff into SVID 26.6 |
| 1/23/97 | manure wastewater discharge from lagoon into SVID drain 26.6 |
| 5/27/97 | manure wastewater discharge from drainpipe E. Zillah facility into a ditch approximately one half mile south corner of E. Zillah Rd. and Liberty Rd. |
| 6/23/97 | manure wastewater discharge into SVID drain 26.6 |

The Appendix B violations added in the complaint read as follows:

> Violations at Bosma and Liberty Dairies Discovered by Plaintiffs After Sending the October 31, 1997 Notice of Intent to Sue

| | |
|---|---|
| 4/2/93 | Overapplication of waste to land |
| 2/7/94 | Breach of dyke |
| 1/17/95 | Ditch gates leaking to canal |
| 1/20/95 | Discharge to canal from leaking irrigation line |
| 4/19/96 | Overapplication, manure scraped into gully, discharge to SVID drain |

| | |
|---|---|
| 4/20/96 | Overapplication, manure scraped into gully, discharge to SVID drain |
| 4/21/96 | Overapplication, manure scraped into gully, discharge to SVID drain |
| 4/23/96 | Overapplication, manure scraped into gully, discharge to SVID drain |
| 1/13/97 | Spraying on frozen ground, hole in lagoon, discharge to SVID drain |
| 1/14/97 | Spraying on frozen ground, hole in lagoon, discharge to SVID drain |
| 1/16/97 | Spraying on frozen ground, hole in lagoon, discharge to SVID drain |
| 2/25/97 | Overapplication of waste to land |
| 3/3/97 | Overapplication of waste to land, discharge to SVID drain |
| 3/13/97 | Discharge to SVID drain |
| 3/14/97 | Discharge to SVID drain |
| 3/20/97 | Discharge to SVID drain |
| 3/21/97 | Discharge to SVID drain |
| 3/27/97 | Discharge to SVID drain |
| 3/28/97 | Discharge to SVID drain |
| 4/3/97 | Discharge to SVID drain |
| 4/4/97 | Discharge to SVID drain |
| 4/10/97 | Discharge to SVID drain |
| 4/11/97 | Discharge to SVID drain |
| 4/17/97 | Manure leaking to canal |
| 7/25/97 | Erosion of lagoon, discharge to SVID drain |
| 7/26/97 | Erosion of lagoon, discharge to SVID drain |
| 7/27/97 | Erosion of lagoon, discharge to SVID drain |
| 7/28/97 | Erosion of lagoon, discharge to SVID drain |
| 8/23/97 | Discharge to SVID drain |
| 8/24/97 | Discharge to SVID drain |
| 8/25/97 | Discharge to SVID drain |
| 9/9/97 | Discharge to SVID drain |

The Appendix B discharge violations are sufficiently similar to those contained in the notice and allowing plaintiffs to sue on these violations does not undermine the purpose of the citizen suit provision or the requirements established by the EPA. First, CARE, in its notice letter, provided Bosma with a range of dates during which the violations later listed in Appendix B occurred. *See, e.g., Cal. Sportfishing*, 905 F.Supp. at 799 (stating that "the date or dates of the violation must be stated with some specificity" and while it would be best if the plaintiff provided the specific date, the plaintiff should at least "give a range as to the date that is reasonably limited"). The Appendix B violations occurred within the same time frame, at times the same month, as allegations listed

in CARE's notice. *C.f. Brandywine Indus. Paper, Inc. v. Chemical Leaman Tank Lines, Inc.*, 1998 WL 855502, at *4 (E.D.Pa.1998) (holding that the notice given by the plaintiffs was not sufficiently specific because it failed to provide "an average general range of the dates of the CWA and CERCLA violations").

Second, the violations alleged by CARE, both in the complaint and the notice, are that the two dairies, which milk cows in a confined space, produce manure which runs into a single drain ditch—J.D. 26.6. The violations originated from the same source, the CAFO dairies, which deposited the same waste material, manure, into clearly identifiable navigable waters of the U.S., J.D. 26.6. Thus, in essence all of the alleged violations are a single violation that repeated over a span of time. *See Atlantic States*, 116 F.3d at 819–20 ("In practical terms, the notice must be sufficiently specific to inform the alleged violator about what it is doing wrong, so that it will know what corrective actions will avert a lawsuit .... The key to notice is to give the accused company the opportunity to correct the problem."). Furthermore, the waters into which Bosma allegedly discharged manure is a small, identifiable strip of the drain. The notice sent by CARE, as well as the additional discharges listed in the complaint, stated that manure was discharged to J.D. 26.6. The district court noted that Joint Drain 26.6 "can be walked from its southern point on Bosma's property to the northern point on Bosma's property in 15 to 20 minutes." *CARE v. Henry Bosma Dairy, et al.*, 65 F.Supp.2d 1129, 1138 (E.D.Wash.1999). In addition, Bosma had an extensive complaint and verified discharges history with WADOE that made both parties acutely aware of the location and course of J.D. 26.6. *Id.* Therefore, CARE's notice provided sufficient detail to Bosma and the relevant agencies.

As the Third Circuit stated in *Hercules*, § 1365 does not "compel a finding that a citizen must give notice to recipients of each individual violation of a specific discharge limitation." 50 F.3d at 1248. The court reasoned that

> if a permit holder has discharged pollutant 'x' in excess of the permitted effluent limit five times in a month but the citizen has learned of only four violations, the citizen will give notice of the four violations of which the citizen then has knowledge but should be able to include the fifth violation in the suit when it is discovered. Whether the agency or the permit holder is informed of four or five excess discharges of pollutant 'x' will probably make no difference in a decision to bring about compliance.

*Id.* In creating the citizen suit provision, Congress sought to "strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits." *Hallstrom*, 493 U.S. at 29, 110 S.Ct. 304. The purpose of the 60 day notice is to provide the agencies and the defendant with information on the cause and type of environmental laws or orders the defendant is allegedly violating so that the agencies can step in, investigate, and bring the defendant into compliance. The point is to trigger agency enforcement and avoid a lawsuit. Congress did not intend to unduly burden citizens by requiring them to basically carry out the job of the agency. Based on the fact that the violations originated from the same source, were of the same nature, and were easily identifiable, we find that CARE's notice was adequate. The notice allowed Bosma to identify the violations contained therein and in Appendix B.

## II. Ongoing Violations

■ When reviewing a district court's conclusion that there was an "ongoing vio-

lation" of the CWA, the Ninth Circuit reviews findings of fact for clear error and conclusions of law de novo. *Southwest Marine*, 236 F.3d at 998.

■■ To prevail at trial, a citizen-plaintiff must prove an ongoing violation. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found. Inc.*, 484 U.S. 49, 64, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). "[A] citizen plaintiff may prove ongoing violations either (1) by proving violations that continue on or after the date the complaint is filed or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Sierra Club v. Union Oil Co.*, 853 F.2d 667, 671 (9th Cir.1988) (internal quotations omitted). This circuit has confirmed that "[i]ntermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition." *Id.* (internal quotations omitted).

■ The district court found "that as of the date of the filing of the complaint, January 15, 1998, there was a continuing violation and a reasonable likelihood of recurrent violations of the following: (1) discharges of wastewater from the truck wash to J.D. 26.6, (2) misapplication or overapplication of animal wastewaters to the 14.3 acre field which would flow down the slope east into J.D. 26.6, and (3) a long history of repeated violations resulting from discharges to J.D. 26.6 and the Canal due to operation and maintenance of the Dairies." *Bosma*, 65 F.Supp.2d at 1134. We find that the record supports the district court's conclusions.

### A. *Truck Wash*

Bosma argues that there was no evidence that any water from the truck wash discharged into navigable waters of the U.S. This argument lacks merit. The dis-

trict court held that on January 15, 1998 (when CARE filed its complaint) there was evidence of a continuing violation of the CWA due to discharges of wastewater from the truck wash to J.D. 26.6. The court noted that in 1998 the DWMP stated that wastewater from the vehicle wash area was piped to the Sunnyside Valley Irrigation Drain (SVID). Although Bosma argued that the drain was capped in March of 1998, the court found that Bosma had not presented sufficient evidence to prove that this condition was not a continuing violation. The court pointed to specific evidence that belied Bosma's claim that the drain was capped. The court noted that if the drain had been capped Bosma would have notified the person he hired to review the DWMP and the dairy facilities that such condition had now been corrected. The court's findings are supported by evidence, and, accordingly are not clearly erroneous.

### B. *Misapplication/Overapplication of wastewaters*

Bosma argues that the district court erred in finding an ongoing violation with regards to the 14.3 acre field. We disagree. The court relied on testimony presented at the trial of residents who live in the area who stated that they had seen manure wastewater applied to the field and spilling into the Canal. Thus, the district court found that Bosma was over-applying or misapplying manure wastewater to the field and that the topography of the field indicated that the wastewater would flow down the slope east into J.D. 26.6. Notwithstanding Bosma's argument, we may not disturb this finding since it is supported by evidence.

### C. *Discharges*

The district court held that Bosma's history of a variety of repeated violations of

the CWA resulting from discharges to J.D. 26.6 and the Canal makes it likely that there will be intermittent discharges to J.D. 26.6 and the Canal. The court based its findings on the poor operation and maintenance of the dairies. WADOE had cited Bosma for several verified discharges over the years. Bosma did not dispute these verified discharges and often failed to pay the penalties until pressured by WADOE. Testimony, photos, and video showed that Bosma had placed deposits of manure in proximity to the water after CARE filed suit. In addition, witnesses testified that they saw manure water spilling into the Canal. The district court did not err in finding that CARE proved the existence of ongoing violations by showing that such violations had a likelihood of recurring.

## III.   Other Issues Raised on Appeal

### A.   *Waters of the United States*

We find that the district court did not err in finding that J.D. 26.6 fits under the definition of "navigable waters."

■ The CWA defines "navigable waters" as "waters of the United States." 33 U.S.C. § 1362(7). In *Headwaters, Inc. v. Talent Irrigation District*, 243 F.3d 526 (9th Cir.2001), our circuit held that irrigation canals are waters of the United States because they are tributaries to other waters of the United States. A stream which contributes its flow to a larger stream or other body of water is a tributary. *Id.* at 533. Our circuit reasoned that "[e]ven tributaries that flow intermittently are 'waters of the United States'." *Id.* at 534. As the district court noted, at three points in the SVID, water in the Canal is returned to the Yakima River. The Yakima River falls within the definition of "waters of the United States" and no parties dispute this. The SVID takes water out of the Yakima River at Parker Dam in the

Spring of each year. The water runs through the Canal bringing water to the land serviced by the Canal. Water runs back to the Canal through a series of returns composed of water not used by irrigators and irrigation runoff. The drainage supervisor, Mr. Shuck, and the district manager for SVID, Mr. Trull, testified that J.D. 26.6 eventually drains into the Yakima River by way of either the Granger drain or the Canal. During the winter months, water from the J.D. 26.6 drain empties into the Granger Drain, which empties into the Yakima River. In the spring and summer, J.D. 26.6 flows directly into the Canal. Thus, the evidence suggests that J.D. 26.6 drains, either directly or by connecting waterways, into the Yakima River. Therefore, the district court did not clearly err in holding that J.D. 26.6 qualifies as a navigable water under the CWA.

### B. *CAFOs*

■ The CWA regulates the discharge of pollutants and defines "discharge of pollutant" as "any discernable, confined and discrete conveyance from any point source." 33 U.S.C. § 1362(12). Point source is defined to include a CAFO, and animal feeding operations come within the definition of a CAFO by having specified quantities of animals and discharging pollutants into navigable waters. 33 U.S.C. § 1362(14). The regulatory definition of a CAFO is found at 40 C.F.R. § 122.23(b) (1994). This provision defines CAFO as an animal feeding operation ("AFO") where animals are stabled or confined for a total of 45 days or more in any 12 month period in an area where neither crops, vegetation or crop residue is sustained. 40 C.F.R. § 122.23(a)(3). CAFOs also include animal feeding operations with more than 700 mature dairy cattle. 40 C.F.R. 122.23(b). The Bosma Dairy has at least 2500 mature dairy cattle confined and

maintained in an area where neither crops or vegetation is grown. Liberty Dairy has at least 3000 mature cattle confined in a similar area. WADOE has designated each facility as a CAFO and issued a NPDES permit. The dairies meet the definition of a CAFO. As such, they are point sources subject to the NPDES permit requirement and cannot discharge animal wastes without a permit or in violation of a permit.

■ Bosma admits that a portion of the dairies are point sources but argues that the district court erred in finding that Bosma's fields where manure is stored and ditches therein are part of the CAFO and thus, point sources. We disagree. We note that the "definition of a point source is to be broadly interpreted." *Dague v. City of Burlington*, 935 F.2d 1343, 1354 (2d Cir.1991). The CWA considers agricultural waste discharged into water a pollutant. *See* 33 U.S.C. § 1362(6). The very nature of a CAFO and the amount of animal wastes generated constitute a large threat to the quality of the waters of the nation. Therefore, Congress empowered the EPA to regulate CAFOs as point sources. 40 C.F.R. § 122.23(c). Defining a CAFO to include any manure spreading vehicles, as well as manure storing fields, and ditches used to store or transfer the waste serves the purpose of the CWA to control the disposal of pollutants in order to restore and maintain the waters of the United States. 33 U.S.C.A. § 125(a) (West 1986 & supp.1995); *CARE v. Southview Farm*, 34 F.3d 114, 123 (2d Cir.1994) (holding that the liquid manure spreading operations are a point source within the meaning of CWA § 1362(14) because the farm itself falls within the definition of CAFO and is not subject to the agricultural exemption). Bosma meets the statutory definition of a CAFO and has failed to

three violations (not six) in 1997 which WADOE found to be "corrected." In addition, CARE fails to list any specific dates or credible evidence to support the alleged violations in the summer of 1997.

Second, the district court did not err in reducing CARE's fees because CARE did not prevail on all three claims raised in the complaint. In *Harris v. Marhoefer*, 24 F.3d 16 (9th Cir.1994), we affirmed a district court's reduction of attorney's fees due to the plaintiff's partial success stating that the district court properly exercised its discretion because " 'the relief, however significant, is limited in comparison to the scope of the litigation as a whole.' " *Id.* at 19 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). In this case the district court examined the success achieved by CARE and held that while "CARE had limited success on the actual number of violations proven at trial.... CARE did prove that Bosma ... was continuing to violate the CWA. Further, CARE met its burden to prove that there was a reasonable likelihood that these violations would recur in the future." *Bosma*, 2001 WL 1704240 at *21. The court further noted that by bringing the suit, CARE had conferred a benefit on the public at large. Yet, the court held that a "full fee award would be excessive in light of CARE's limited success." *Id.* We find no error with the district court's conclusion.

## CONCLUSION

For the reasons stated above we affirm the district court.

**AFFIRMED.**